Michael J. Stortz (SBN 139386)
580 California Street, Suite 1500
San Francisco, CA 94104-1036
AKIN GUMP STRAUSS HAUER & FELD LLP
Email: mstortz@akingump.com
Telephone: 415.765.9500
Facsimile: 415.765.9501

Seamus C. Duffy*
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103-7013
Email: sduffy@akingump.com
Telephone: 215.965.1200
Facsimile: 215.965.1210

Attorneys for Defendant
COMCAST CABLE COMMUNICATIONS, LLC
*pro hac vice to be sought

Ray E. Gallo (SBN 158903)
rgallo@gallo.law
GALLO LLP
100 Pine St., Suite 1250
San Francisco, CA 94111
Phone:  415.257.8800

Hank Bates (SBN 167688)
hbates@cbplaw.com
David Slade (*pro hac vice*)
dslade@cbplaw.com
CARNEY, BATES & PULLIAM, PLLC
519 West 7th Street
Little Rock, AR 72201
Telephone:   501-312-8500

Attorneys for Plaintiff
BRANDON HODGES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| BRANDON HODGES, for himself, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC, a Delaware limited liability company; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 4:18-cv-01829-HSG<br><br>**JOINT STATUS REPORT** |

1    Pursuant to the Court's Order dated September 29, 2020 (Dkt. No. 80), Defendant Comcast

2    Cable Communications, LLC and Plaintiff Brandon Hodges submit as **Exhibit A** to this joint

3    status report the Ninth Circuit's decision in *Hodges v. Comcast Cable Communications, LLC*, No.

4    19-16483.

5

6    Dated: September 13, 2021                    AKIN GUMP STRAUSS HAUER & FELD LLP

7
                                                  By: */s/ Michael J. Stortz*
8                                                     Michael J. Stortz

9                                                 Attorneys for Defendant
                                                  COMCAST CABLE COMMUNICATIONS, LLC
10

11   Dated: September 13, 2021                    GALLO LLP

12
                                                  By: */s/ Ray Gallo*
13                                                    Ray Gallo

14                                                Attorneys for Plaintiff
                                                  BRANDON HODGES
15

16                   **Attestation Pursuant to Civil Local Rule 5-1(i)**

17       Pursuant to Civil Local Rule 5-1(i), I, Michael J. Stortz, hereby attest that I have obtained

18   concurrence in the filing of this document from the other signatories to this document.

19       I declare under penalty of perjury under the laws of the United States of America that the

20   foregoing is true and correct. Executed this September 13, 2021, in San Francisco, California.

21

22                                                      */s/ Michael J. Stortz*
                                                        Michael J. Stortz
23

24

25

26

27

28

EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRANDON HODGES,<br>                    *Plaintiff-Appellee*,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS,<br>LLC, a Delaware limited liability<br>company,<br>                    *Defendant-Appellant.* | No. 19-16483<br><br>D.C. No.<br>4:18-cv-01829-<br>HSG<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted June 1, 2020
Portland, Oregon

Filed September 10, 2021

Before:  Marsha S. Berzon, Daniel P. Collins, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Collins;
Dissent by Judge Berzon

## SUMMARY*

---

### Arbitration

The panel reversed the district court's order denying Comcast Cable Communications, LLC's motion to compel arbitration under the Federal Arbitration Act of the claims asserted against it by former cable subscriber Brandon Hodges, and remanded with instructions to grant the motion.

Hodges brought a putative class action challenging certain of Comcast's privacy and data-collection practices and seeking a variety of monetary and equitable remedies. Comcast moved to compel arbitration pursuant to Hodge's subscriber agreements. The district court held that, because Hodges' complaint sought "public injunctive relief" as one of its requested remedies, the complaint implicated California's *McGill* rule, under which an arbitration provision that waives the right to seek "public injunctive relief" in all forums is unenforceable.

The panel held that the applicability of the *McGill* rule depends upon whether a complaint includes a claim for public injunctive relief. Taking into account *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019) (holding that the Federal Arbitration Act does not preempt the *McGill* rule), the panel held that, under California law, non-waivable public injunctive relief is limited to forward-looking injunctions that seek to prevent future violations of law for the benefit of the general public as a whole, as opposed to a

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

particular class of persons, and that do so without the need to consider the individual claims of any non-party. Declining to rely on *Mejia* and *Maldonado*, recent California Court of Appeal decisions broadening the *McGill* rule, the panel concluded that these decisions rested on such a patent misreading of California law that they would not be followed by the California Supreme Court.

The panel concluded that under the above standard, Hodges' complaint did not seek public injunctive relief. Accordingly, the *McGill* rule was not implicated, and the arbitration agreement should have been enforced.

Dissenting, Judge Berzon wrote that she disagreed with the majority's conclusion, contrary to the court's precedent and to recent decisions of the California Court of Appeal, that a forward-looking injunction protecting the privacy rights of millions of cable consumers was not "public injunctive relief" under California state law.

---

**COUNSEL**

Mark A. Perry (argued) and Joshua M. Wesneski, Gibson Dunn & Crutcher LLP, Washington, D.C.; Michael W. McTigue Jr. and Meredith C. Slawe, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, Pennsylvania; Michael J. Stortz, Akin Gump Strauss Hauer & Feld LLP, San Francisco, California; for Defendant-Appellant.

Karla Gilbride (argued), Public Justice P.C., Washington, D.C.; Ray Gallo, Gallo LLP, San Francisco, California; Hank Bates and David Slade, Carney, Bates & Pulliam PLLC, Little Rock, Arkansas; for Plaintiff-Appellee.

## OPINION

COLLINS, Circuit Judge:

Comcast Cable Communications, LLC ("Comcast") appeals the district court's denial of its motion to compel arbitration of the claims asserted against it by former cable subscriber Brandon Hodges. Hodges brought this putative class action challenging certain of Comcast's privacy and data-collection practices and seeking a variety of monetary and equitable remedies. The district court held that, because Hodges' complaint sought "public injunctive relief" as one of its requested remedies, the complaint implicated the so-called "*McGill* rule," under which a contractual provision that waives the right to seek "public injunctive relief" in all forums is unenforceable. *McGill v. Citibank, N.A.*, 393 P.3d 85, 87 (Cal. 2007). The parties did not dispute that, if the relief Hodges seeks is classified as public injunctive relief, the non-severable arbitration provisions of Hodges' subscriber agreements with Comcast did seek to waive that public injunctive relief in any forum. Accordingly, the district court held that those provisions were unenforceable under *McGill*. We conclude that the district court misconstrued what counts as "public injunctive relief" for purposes of the *McGill* rule and that it therefore erred in concluding that the complaint here sought such relief. Because Hodges' complaint did not seek such relief, the *McGill* rule is not implicated, and the arbitration agreement should have been enforced. We therefore reverse the district court's denial of Comcast's motion to compel.

## I

Between October 2015 and January 2018, Hodges subscribed to Comcast's cable television services at his home in Oakland, California. In February 2018, Hodges

filed a complaint in California state court on behalf of a putative class of California residential Comcast subscribers, alleging that Comcast violated class members' statutory privacy rights in collecting "data about subscribers' cable television viewing activity" as well as "personally identifiable demographic data about its subscribers." Specifically, Hodges alleged that Comcast violated the Cable Communications Policy Act of 1984 ("Cable Act"), by (1) failing to clearly inform subscribers of how long Comcast would keep such information; (2) failing to provide subscribers with access to this information upon request; and (3) failing to obtain subscribers' consent before gathering information about viewing activity. *See* 47 U.S.C. § 551(a)(1)(C), (b), (d). Hodges also alleged that Comcast violated the California Invasion of Privacy Act ("CIPA"), by (1) failing to obtain subscribers' consent before using its cable boxes to collect viewing activity; and (2) failing to disclose, within 30 days of a subscriber request, "individually identifiable subscriber information" Comcast had collected. CAL. PEN. CODE § 637.5(a)(1), (d). In addition, Hodges asserted that the same five violations of the Cable Act and CIPA constituted "unlawful" business practices, thereby giving rise to a derivative cause of action under California's unfair competition law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq*. On behalf of himself and the putative class, Hodges sought liquated, statutory, and punitive damages; seven specified forms of "statewide public injunctive relief"; and attorney's fees.

Comcast removed the case to the U.S. District Court for the Northern District of California based on federal question jurisdiction, *see* 28 U.S.C. § 1331, and diversity jurisdiction under the Class Action Fairness Act, *id*. § 1332(d). Noting that each version of Hodges' various "Subscriber Agreements" with Comcast contained an arbitration

provision, Comcast then moved to compel arbitration. Hodges opposed the motion, arguing that the arbitration provision was unenforceable under *McGill* because its non-severable "Waiver of Class Actions and Collective Relief" impermissibly deprived Hodges of the right to pursue public injunctive relief in any forum.[1]  In reply, Comcast argued that *McGill* was inapplicable because Hodges was not seeking public injunctive relief and that, in any event, the *McGill* rule is preempted by the Federal Arbitration Act ("FAA").

Because the question of whether *McGill* was preempted by the FAA had already been raised in several cases before this court, the district court stayed the case pending our

---

[1] For example, the final agreement Hodges received in January 2018, when he terminated his cable service but continued internet service with Comcast, included the following language (which is reproduced here without its use of all capitalization):

> **Waiver of Class Actions and Collective Relief.** There shall be no right or authority for any claims to be arbitrated or litigated on a class action, joint or consolidated basis or on bases involving claims brought in a purported representative capacity on behalf of the general public (such as a private attorney general), other subscribers, or other persons.  The arbitrator may award relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that individual party's claim.  The arbitrator may not award relief for or against anyone who is not a party.  The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.  This waiver of class actions and collective relief is an essential part of this arbitration provision and cannot be severed from it.

resolution of that issue. After we held in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 822 (9th Cir. 2019), that the FAA did not preempt the *McGill* rule, the district court denied Comcast's motion to compel arbitration. Comcast filed an interlocutory appeal challenging the district court's ruling, and we have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(B).

## II

Section 2 of the FAA provides that

> [a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Supreme Court has "described this provision as reflecting both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *Id.* (simplified). The final clause of § 2—the "saving clause"—confirms that arbitration agreements, like any other contract, can be invalidated on generally applicable grounds "for the revocation of any contract." 9 U.S.C. § 2. But arbitration agreements may not be invalidated "by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339.

This case involves one such ground for contractual invalidation under California law, *viz.*, the so-called "*McGill*

rule."   Under that rule, insofar as a contractual provision "purports to waive [a party's] right to request in any forum . . . public injunctive relief, it is invalid and unenforceable under California law."  *McGill*, 393 P.3d at 94.  We held in *Blair* that "the FAA does not preempt the *McGill* rule," 928 F.3d at 830–31, and we therefore reject Comcast's contrary arguments here.   The only remaining question before us, then, is whether Comcast's enforcement of the Subscriber Agreement in this case violates the *McGill* rule. We conclude that, because Hodges' complaint does not seek public injunctive relief, the *McGill* rule is not implicated and that rule therefore does not bar enforcement of the arbitration provision.

## A

As an initial matter, Hodges argues that, in addressing whether the *McGill* rule is implicated in this case, it is irrelevant whether his complaint "actually includes a claim" for public injunctive relief.  All that matters, in his view, is whether the Subscriber Agreement's language theoretically purports to waive public injunctive relief in *any* case.  This argument is foreclosed by *McGill* itself.   In addressing whether the contract in that case was unenforceable, the California Supreme Court stated that, in "answering this question, we *first* conclude that McGill's complaint does, in fact, appear to seek . . . public injunctive relief."  393 P.3d at 90 (emphasis added).   And in *Mejia v. DACM Inc.*, 268 Cal. Rptr. 3d 642 (Cal. Ct. App. 2020), the California Court of Appeal likewise began its analysis of the applicability of the *McGill* rule by addressing whether the operative complaint actually sought public injunctive relief in the first place.  *See id*. at 650–53 (holding that the complaint *did* seek such relief and that *McGill* invalidated the arbitration provision).

The same conclusion follows from our decision in
*Kilgore v. KeyBank, N.A.*, 718 F.3d 1052 (9th Cir. 2013) (en
banc). In *Kilgore*, we held that it was unnecessary to reach
the particular FAA preemption question presented there
precisely *because* the plaintiffs' requested injunctions in that
case did not qualify as public injunctive relief. 718 F.3d
at 1060–61. *Kilgore* involved the distinct "*Broughton-Cruz*
rule," *id*. at 1060, under which "[a]greements to arbitrate
claims for public injunctive relief" under certain California
consumer statutes "are not enforceable in California,"
*McGill*, 393 P.3d at 90.[2] Under Hodges' flawed view of
California law, the mere *presence* of a requirement to
arbitrate public injunctive relief in a contract should have
been enough to invalidate the arbitration provision in
*Kilgore* under the *Broughton-Cruz* rule—meaning that the
ability to compel arbitration in *Kilgore* could *not* depend
upon whether public injunctive relief was actually being
requested in that case. But we held exactly the opposite,
concluding that the particular injunctions being sought by
the plaintiffs in *Kilgore* did not involve public injunctive
relief; that the *Broughton-Cruz* rule therefore was not
implicated; that we therefore did not need to decide whether
that rule was preempted by the FAA; and that arbitration was
required. *Kilgore*, 718 F.3d at 1060–61.[3] The California
Court of Appeal followed the same approach in another case

---

[2] The rule's name derives from the pair of cases that established it,
namely, *Broughton v. Cigna Healthplans of California*, 988 P.2d 67, 76
(Cal. 1999), and *Cruz v. PacifiCare Health Systems, Inc.*, 66 P.3d 1157,
1164–65 (Cal. 2003).

[3] We later held that, given the fact that the *Broughton-Cruz* rule
applied *only* to *arbitration* agreements, it was not a generally applicable
ground for invalidating a contract and was therefore preempted by the
FAA. *See Blair*, 928 F.3d at 827; *Ferguson v. Corinthian Colleges, Inc.*,
733 F.3d 928, 934 (9th Cir. 2013).

addressing the applicability of the *Broughton-Cruz* rule. *See Clifford v. Quest Software Inc.*, 251 Cal. Rptr. 3d 269, 276–78 (Cal. Ct. App. 2019) (concluding that the relevant cause of action did not seek public injunctive relief and that arbitration therefore could be compelled without addressing whether the *Broughton-Cruz* rule was preempted).

The applicable precedent thus forecloses Hodges' argument that courts should stretch to invalidate contracts based on hypothetical issues that are not actually presented in the parties' dispute. We therefore turn to whether Hodges' complaint requests public injunctive relief within the meaning of the *McGill* rule.

## B

We begin by setting forth the standards for what constitutes non-waivable public injunctive relief under California law. In addressing that question, we "'are bound by decisions of the state's highest court,'" *Alliance for Prop. Rights & Fiscal Responsibility v. City of Idaho Falls*, 742 F.3d 1100, 1103 (9th Cir. 2013) (citation omitted), and in deciding any unresolved or unclear questions of state law, we are guided by the principles that the state high court has articulated, *id.* In construing the substantive scope of *McGill*'s contract-invalidation rule, we also cannot lose sight of the critical limitations on that rule that saved it from preemption as a matter of federal law in *Blair*. We review all questions of law de novo. *United States v. Robertson*, 980 F.3d 672, 675 (9th Cir. 2020).

## 1

*McGill* derived its rule against waiver of public injunctive relief from California Civil Code § 3513, which provides: "Any one may waive the advantage of a law

intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement."  *See* 393 P.3d at 93–94.  Because the primary consumer protection laws at issue in *McGill*—*i.e.*, the UCL; the Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*; and California's false advertising law, CAL. BUS. & PROF. CODE § 17500 *et seq.*—all authorize injunctive relief that is primarily "for the benefit of the general public," *Broughton*, 988 P.2d at 78 (making this point as to the CLRA); *see also Cruz*, 66 P.3d at 1164–65 (same as to the UCL and the false advertising law), the *McGill* court held that any waiver of the "right to request in any forum such public injunctive relief . . . is invalid and unenforceable under California law."  393 P.3d at 94.

Consistent with California Civil Code § 3513's distinction between relief for the benefit of private individuals and relief for the benefit of the general public as a whole, *McGill* explained that California law

> distinguished between private injunctive relief—*i.e.*, relief that primarily resolves a private dispute between the parties and rectifies individual wrongs and that benefits the public, if at all, only incidentally—and public injunctive relief—*i.e.*, relief that by and large benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public.

393 P.3d at 89 (simplified).  In further describing the sort of "public injunctive relief" that is not subject to waiver under California law, the California Supreme Court in *McGill* emphasized three key features.

First, the Court stated that public injunctive relief "has 'the primary purpose and effect of' *prohibiting* unlawful acts that threaten *future* injury to the general public." *McGill*, 393 P.3d at 90 (emphasis added) (citation omitted). Thus, in contrast to relief aimed at "redressing or preventing injury" to a person or group of persons, *id.*, forward-looking relief that generally aims to prevent unlawful conduct in the future is more likely to be characterized as reflecting statutory rights that are "established for a public reason." CAL. CIV. CODE § 3513.

Second, the *McGill* court emphasized that a request for public injunctive relief "does *not* constitute the pursuit of representative claims or relief on behalf of others," nor does it involve "prosecut[ing] actions on behalf of the general public." 393 P.3d at 92–93 (simplified) (emphasis added). The court made this observation in the course of explaining why Proposition 64's amendments to the UCL did not eliminate the ability of a private plaintiff to seek public injunctive relief under that statute. Proposition 64 stated that UCL actions on behalf of the general public could be brought by "only the California Attorney General and local public officials," Prop. 64, § 1(f), and it further prohibited any private representative actions other than class actions, *see* CAL. BUS. & PROF. CODE § 17203. The *McGill* court held that these limitations did not affect the ability of a private UCL plaintiff to request public injunctive relief, because such relief did not require any such representative action, either on behalf of a class or the general public. Rather, as the court explained, the requirement that an "'action be brought as a class action'" has "never been imposed with regard to requests to enjoin future wrongful business practices that will injure the public." 393 P.3d at 93 (citation omitted).

Third, the court relatedly drew a sharp distinction with respect to ascertainability between the beneficiaries of private and public injunctive relief. The court explained that, in contrast to private injunctive relief, which provides benefits "to an individual plaintiff—or to a *group of individuals similarly situated* to the plaintiff," public injunctive relief involves diffuse benefits to the "general public" as a whole, and the general public "'fails to meet'" the class-action requirement of "'an ascertainable class.'" 393 P.3d at 90, 93 (emphasis added) (citations omitted).

It follows that public injunctive relief within the meaning of *McGill* is limited to forward-looking injunctions that seek to prevent future violations of law for the benefit of the general public as a whole, as opposed to a particular class of persons, and that do so without the need to consider the individual claims of any non-party. The paradigmatic example would be the sort of injunctive relief sought in *McGill* itself, where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan. 393 P.3d at 90–91. Such an injunction attempts to stop future violations of law that are aimed at the general public, and imposing or administering such an injunction does not require effectively fashioning individualized relief for non-parties. *See also Cruz*, 66 P.3d at 1159–60 (plaintiff sought injunctive relief against PacifiCare's false advertising in "misrepresenting or failing to disclose internal policies that lower the quality of services provided"); *Broughton*, 988 P.2d at 71 (plaintiff sought "an order enjoining [defendant Cigna's] deceptive methods, acts, and practices," which allegedly included "deceptively and misleadingly advertis[ing] the quality of medical services which would be provided under its health care plan").

By contrast, when the injunctive relief being sought is
for the benefit of a discrete class of persons, or would require
consideration of the private rights and obligations of
individual non-parties, it has been held to be private
injunctive relief. For example, in *Kilgore*, the plaintiffs
alleged that the loans and contracts they had executed to
attend a since-failed helicopter-pilot school did not contain
certain disclosures required by Federal Trade Commission
regulations. 718 F.3d at 1056 & n.3. As a remedy, the
plaintiffs sought an injunction under the UCL to prevent the
defendant bank from reporting their student loan defaults to
credit agencies and from enforcing the student loan notes.
*Id.* Sitting en banc, we held that the plaintiffs were not
seeking public injunctive relief because the requested
injunction against enforcing these loans or reporting
associated loan defaults on credit reports "plainly would
benefit only the approximately 120 putative class members"
and not the general public. *Id.* at 1060–61. We further noted
that, in contrast to seeking forward-looking relief against
future unlawful acts aimed at the general public, the
requested injunction, "for all practical purposes, relates only
to *past* harms suffered by the members of the limited
putative class." *Id.* at 1061 (emphasis added).

Likewise, in *Clifford*, the California Court of Appeal
held that even prospective injunctive relief was not "public"
when the primary beneficiaries were a defined group of
similarly situated persons, rather than the general public.
There, the plaintiff alleged a variety of wage and hour claims
arising from his employer's alleged misclassification of him
as an "exempt employee." 251 Cal. Rptr. 3d at 273.
Although the plaintiff sought an injunction to prevent his
employer from committing further similar violations of law
in the future, the court held that this did *not* constitute a
request for public injunctive relief. The only "potential

beneficiaries" of the requested forward-looking relief were "Quest's *current* employees, not the public at large." *Id.* at 277 (emphasis added). In reaching this conclusion, the court emphasized *McGill*'s statement that, in order to qualify as public injunctive relief, the requested injunction must go beyond "'redressing or preventing injury to an individual plaintiff—*or to a group of individuals similarly situated to the plaintiff.*'" *Id.* at 278 (quoting *McGill*, 393 P.3d at 90) (emphasis added by *Clifford*); *see also Torrecillas v. Fitness Int'l, LLC*, 266 Cal. Rptr. 3d 181, 191 (Cal. Ct. App. 2020) (requested relief was not public injunctive relief because the "beneficiary of an injunction would be Torrecillas and possibly Fitness's current employees, not the public at large").

We emphasized these same key features of public injunctive relief when we held in *Blair* that the *McGill* rule was not preempted by the FAA. Thus, in holding that public injunctive relief did not entail a level of procedural formality or complexity that would be inconsistent with arbitration's goal of streamlined proceedings, we expressly relied on *McGill*'s holdings that (1) a "plaintiff requesting a public injunction files the lawsuit 'on his or her own behalf,'" and not in any sort of representative capacity; (2) as a result, "claims for public injunctive relief need not comply with state-law class procedures"; and (3) the beneficiaries of public injunctive relief are "the general public" as a whole and not "specific absent parties." *Blair*, 928 F.3d at 828–29. In light of these crucial features of the *McGill* rule, we held that a request for public injunctive relief "does not interfere with the bilateral nature of a typical consumer arbitration." *Id.* at 829; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) ("In bilateral arbitration, parties forego the procedural rigor . . . in order to realize the benefits of private dispute resolution: lower costs, greater

efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."). Moreover, in explaining why the relief sought in *Blair* included public injunctive relief, we noted that it sought to stop Rent-A-Center from using an unlawful pricing structure, 928 F.3d at 822–23, thereby enjoining "future violations" of California law in a manner that diffusely benefitted the general public as a whole, *id*. at 831 n.3.[4]

Given the loadbearing weight we placed on these aspects of *McGill* in *Blair*, we think it is clear that any broader conception of public injunctive relief, beyond what we have set forth above, would have required a different conclusion as to the preemption issue. If California's *McGill* rule had sought to preserve, as non-waivable, the right to formally represent the claims of others, to seek retrospective relief for a particular class of persons, or to request relief that requires consideration of the individualized claims of non-parties, then such a rule would plainly "interfere with the informal, bilateral nature of traditional consumer arbitration." *Blair*, 928 F.3d at 830; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018) (state-law rule that a contract is unenforceable "just because it requires bilateral arbitration"

---

[4] Notably, in reaching that conclusion in *Blair*, we did not rely on the *other* forms of injunctive relief that the plaintiff requested in that case, namely, an order requiring Rent-A-Center to perform a retroactive "accounting of monies obtained from California consumers" and to provide "individualized notice to those consumers of their statutory rights." 928 F.3d at 823. In contrast to the public injunctive relief described in *McGill*, these other forms of requested relief in *Blair* were retrospective, aimed at a specific class of persons (*i.e.*, those who already had Rent-A-Center contracts), or would require individualized consideration of the private rights and obligations of particular non-parties.

is preempted because it "impermissibly disfavors arbitration" (emphasis omitted)).

### 2

In arguing for a broader reading of *McGill*, Hodges relies on the recent decision of Division Three of the Fourth District Court of Appeal in *Mejia*, 268 Cal. Rptr. 3d 642, in which the court substantially broadened the *McGill* rule by effectively defining as "public injunctive relief" *any* forward-looking injunction that restrains *any* unlawful conduct. Hodges also notes that *Mejia*'s analysis was reaffirmed in another recent decision issued by the same division of the same district in *Maldonado v. Fast Auto Loans, Inc.*, 275 Cal. Rptr. 3d 82 (Cal. Ct. App. 2021). For two reasons, Hodges' reliance on these cases is unavailing.

### a

First, *Mejia*'s expanded version of the *McGill* rule rests on such a patent misreading of California law that we do not think it would be followed by the California Supreme Court. *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007) (panel is not required to follow intermediate state appellate authority where there is convincing evidence that the state supreme court would decide differently).

In particular, *Mejia* improperly disregards the key features of public injunctive relief set forth by the state high court in *McGill*. The alleged violation in *Mejia* involved the defendant motorcycle seller's failure to provide purchasers "with a *single document* setting forth all the financing terms" for the sale, *see Mejia*, 268 Cal. Rptr. 3d at 644, and the plaintiff requested an injunction against any *sale* that did not provide the requisite information in a single document, *id.* at 645. By its terms, this relief would primarily benefit the

class of persons who actually purchased motorcycles, and not the general public as a whole. *See McGill*, 393 P.3d at 90 (relief whose "primary purpose or effect" is "preventing injury . . . to a group of individuals similarly situated to the plaintiff . . . does not constitute public injunctive relief"). Moreover, implementing such a decree could require the examination of the paperwork of each individual sale to determine whether the particular financing terms and other requisite disclosures for that given sale were all included in a single document. *See id.* at 93 (public injunctive relief "does not constitute the pursuit of representative claims or relief on behalf of others" (simplified)). As we have explained, these are precisely the sorts of features that have led to a finding of *private* injunctive relief. *See supra* at 13–14.

The *Mejia* court nonetheless held that the relief requested was public. 268 Cal. Rptr. 3d at 651. It did so in a brief discussion that (1) declared, without analysis, that the complaint's requested injunctive relief concerning the sales documents of future motorcycle purchasers "encompasse[d] 'consumers' generally" and (2) then announced that such relief was therefore "'injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.'" *Id.* (quoting *McGill*, 393 P.3d at 87). This truncated analysis effectively shears off the limiting elements that were recited in *McGill* and that we found critical to avoiding preemption in *Blair*. It instead rests on the implicit premise that *any* forward-looking relief to enjoin *any* illegal conduct is automatically public injunctive relief that benefits the general public as a whole. *Id.* This is a clear misreading of *McGill*, *Broughton*, and *Cruz*. *See supra* at 10–13.

To the extent that *Maldonado* follows and applies *Mejia*'s flawed analysis, it is equally mistaken. The plaintiffs in *Maldonado* sought injunctive relief, *inter alia*, that would prevent the defendant lender from charging unconscionably excessive interest rates on loans and that would require the lender to undertake "corrective advertising" and to maintain the requisite California lender licenses. 275 Cal. Rptr. 3d at 85–86. To be sure, some of the relief requested in *Maldonado*—such as an injunction to maintain the appropriate lender licenses and to undertake a corrective advertising campaign—would appear to meet *McGill*'s more circumscribed articulation of what counts as non-waivable public injunctive relief. But *Maldonado* went further and, relying on *Mejia*, held that an injunction aimed at preventing "unconscionable" loan agreements with excessive interest rates was public injunctive relief. *Id.* at 90. For multiple reasons, that conclusion was plainly incorrect.

*Maldonado*'s conclusion that an injunction against unconscionable loan agreements "encompasses all consumers and members of the public," rather than just a discrete class of persons who are similarly situated to the plaintiffs, 275 Cal. Rptr. 3d at 90, is clearly wrong. By its terms, *that* requested relief only benefits those who actually sign lending agreements, and not the public more generally. The court was likewise incorrect in suggesting that such an injunction would not benefit the plaintiffs themselves "because they have already been harmed and are already aware of the misconduct." *Id.* That might be true as to the *other* forms of relief requested (such as corrective advertising), but the plaintiffs and the class members would plainly benefit from an injunction barring unconscionable loan agreements, thereby underscoring that *that* relief is private injunctive relief. The court was also wrong in

suggesting that, simply because an injunction against unconscionable loan agreements with excessive interest rates would also extend to *future* borrowers, the relief was necessarily non-waivable public injunctive relief. *Id.* at 91. As *McGill* makes clear, an incidental public benefit from what is otherwise class-wide private injunctive relief is not sufficient to establish that the requested injunction is actually public relief. 393 P.3d at 89. Furthermore, determining whether any particular future loan agreement was unconscionable due to its interest rate would require an individualized inquiry that considers whether, "under the circumstances of the case, taking into account the bargaining process and prevailing market conditions—a particular rate was 'overly harsh,' 'unduly oppressive,' or 'so one-sided as to shock the conscience.'" *De La Torre v. CashCall, Inc.*, 422 P.3d 1004, 1015 (Cal. 2018) (citations omitted). For all of these reasons, *Maldonado* plainly erred in holding that any injunction aimed at prohibiting the defendant "'from *continuing to engage* in its allegedly illegal and deceptive practices'" is public injunctive relief. 275 Cal. Rptr. 3d at 91 (citation omitted).

The dissent's effort to defend *Mejia* and *Maldonado* is both unpersuasive and inconsistent with other precedent. While conceding that the requested injunctive relief in both cases would primarily benefit only those who entered into contracts with the defendants, the dissent argues that there is nonetheless a benefit to the general public in the sense that persons *considering* entering into such contracts would also be protected. *See* Dissent at 31. But as *McGill* explained, whether a requested injunction is public or private depends upon who are the *primary* beneficiaries, and the existence of an incidental benefit to the general public is not enough to classify that relief as non-waivable public injunctive relief. 393 P.3d at 89. Moreover, as the dissent acknowledges,

other courts—including this court—have already recognized that injunctive relief aimed at regulating the substantive terms of contractual arrangements is private injunctive relief that primarily benefits those who enter into such contracts. *See Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 2021 WL 3282092, at *13 (9th Cir. 2021) (relief regulating Uber drivers' relationship with Uber is primarily directed at those who become Uber drivers and "only 'benefit[s] the general public incidentally'" (quoting *Blair*, 928 F.3d at 824)); *Clifford*, 251 Cal. Rptr. 3d at 277 (requested injunctive relief concerning wages and hours would primarily benefit defendant Quest Software's "current employees" rather than "the public at large").  The dissent seeks to distinguish these cases on the ground that it is more cumbersome to become an employee of Quest Software or an Uber driver, *see* Dissent at 34, but that distinction has nothing at all to do with what *McGill* says is the relevant inquiry, namely, who are the *primary* beneficiaries of the requested injunctive relief.

The dissent is also wrong in contending that our rejection of *Mejia* and *Maldonado* is actually based on the "implicit premise" that the only type of injunction that counts as public injunctive relief is one directed against false advertising.  *See* Dissent at 32.  That strawman argument is belied by the substantive analysis set forth earlier, which merely describes such an injunction as *illustrative* of public injunctive relief, just as *McGill* itself did.  *See* 393 P.3d at 89–90 (noting that *Broughton* and *Cruz*, which involved injunctions against false advertising, were paradigmatic examples of public injunctive relief).  And it is further belied by our acknowledgment that, for example, the request for an injunction that the defendant in *Maldonado* obtain and maintain the required lender licenses qualifies as public injunctive relief.  *See supra* at 19.

22      HODGES V. COMCAST

**b**

Second, even if we are wrong in concluding that the California Supreme Court would not follow *Mejia*'s and *Maldonado*'s broader reading of the *McGill* rule, Hodges' argument would still fail for the independent and alternative reason that their expansion of the *McGill* rule is preempted by the FAA.

As we have explained, the broader *Mejia-Maldonado* rule—namely, that *any* injunction against future illegal conduct constitutes non-waivable public injunctive relief—ignores the key features of the *McGill* rule that saved it from preemption under the FAA in *Blair*. In upholding the *McGill* rule, we emphasized that the category of public injunctive relief described in *McGill* did not involve the sort of procedural complexity or formality that would be inconsistent with the FAA's objective of "'facilitat[ing] streamlined proceedings'" in arbitration. 928 F.3d at 828 (quoting *Concepcion*, 563 U.S. at 344). We reached that conclusion because, as described in *McGill*, public injunctive relief does not entail acting in a representative capacity, does not require class-action procedures, and does not primarily benefit "specific absent parties." *Id*. at 928–29; *see supra* at 15.

The same cannot be said of the broader version of the *McGill* rule embraced in *Mejia* and *Maldonado*. Because it disregards all of the limitations on public injunctive relief that were emphasized in *McGill* and *Blair*, the broader *Mejia-Maldonado* rule forbids waiving claims for prospective injunctive relief against unlawful conduct even if, for example, the implementation of such an injunction would require evaluation of the individual claims of numerous non-parties. The point is illustrated by considering the particular types of injunctive relief sought in

*Mejia* and *Maldonado* themselves—namely, injunctions regulating the drafting and substantive terms of actual contracts with innumerable different persons. *See supra* at 17– 21. Implementing such relief would require a level of procedural complexity that is inherently incompatible "with the informal, bilateral nature of traditional consumer arbitration," *Blair*, 928 F.3d at 830, and with the "efficient, streamlined procedures" that the FAA seeks to protect. *Concepcion*, 563 U.S. at 344; *cf. Broughton*, 988 P.2d at 77 (noting that, "[i]n some cases, the continuing supervision of an injunction is a matter of considerable complexity" that involves "quasi-executive functions of public administration that expand far beyond the resolution of private disputes").[5]

The dissent wrongly discounts the fact that the *Mejia-Maldonado* rule precludes waiver of forward-looking injunctive relief, even if its implementation would involve administrative complexity that is inconsistent with bilateral arbitration. According to the dissent, this concern is irrelevant, because an adjudicator would not need to "examine the claims" of individuals "*before* entering an order like that." *See* Dissent at 36 (emphasis added). But injunctions are not simply words on a page, and their compatibility with bilateral arbitration must be evaluated in light of how they would actually be *implemented*, as the

---

[5] It is worth recalling that, when *Broughton* and *Cruz* initially set out to define a category of public injunctive relief, they did so in the course of formulating a rule that sought to identify forms of relief that were so *fundamentally inconsistent* with arbitration that California law did not permit "this type of injunctive relief to be arbitrated." *Broughton*, 988 P.2d at 76. Such an explicitly anti-arbitration rule is, of course, preempted by the FAA, *see Ferguson*, 733 F.3d at 934, and in *McGill*, the California Supreme Court expressly pivoted away from the "*Broughton-Cruz* rule" and instead sought to define the specific class of public injunctive relief that could never be waived. 393 P.3d at 90.

Case 4:18-cv-01829-PJH Document 286 Filed 09/13/21 Page 27 of 71
Case: 21-1220 Document: 48 Filed: 09/13/2021 Page: 24 of 68

(24 of 68)

California Supreme Court itself recognized in *Broughton*.
988 P.2d at 77.

By insisting that contracting parties may not waive a
form of relief that is fundamentally incompatible with the
sort of simplified procedures the FAA protects, the *Mejia-
Maldonado* rule effectively bans parties from agreeing to
arbitrate all of their disputes arising from such contracts. To
say that such a rule is not preempted would flout Supreme
Court authority. *See*, *e.g.*, *Epic Sys.*, 138 S. Ct. at 1623
(holding that, under *Concepcion*, "courts may not allow a
contract defense to reshape traditional individualized
arbitration" and "a rule seeking to declare individualized
arbitration proceedings off limits" is preempted by the
FAA). And that we cannot do.

## C

Accordingly, we reaffirm that non-waivable "public
injunctive relief" within the meaning of the *McGill* rule
refers to prospective injunctive relief that aims to restrain
future violations of law for the benefit of the general public
as a whole, rather than a discrete subset of similarly situated
persons, and that does so without requiring consideration of
the individual claims of non-parties. *See supra* at 13–14.
With these principles in mind, we address whether Hodges'
complaint seeks such relief. Although the complaint labels
the requested relief as "public," we must look beyond such
conclusory assertions and assess for ourselves whether,
under the applicable standards, the relief requested
implicates the *McGill* rule. We conclude that it does not.

The complaint seeks injunctive relief requiring Comcast
to take the following actions with respect to those persons
who are "cable subscribers" of Comcast (all emphasis
added):

(1) "clearly and conspicuously notify *cable subscribers* in writing, at the requisite times, of the period during which it maintains their [personally identifiable information ("PII")], including video activity data and demographic data";

(2) "stop using its cable system to collect *cable subscribers'* personally identifiable video activity data for advertising purposes without their prior written or electronic consent";

(3) "destroy all personally identifiable video activity data collected from *cable subscribers* for advertising purposes without prior written or electronic consent and any information derived in whole or part from such data";

(4) "change its procedures to provide *cable subscribers* who request access to their PII with access to all such PII in Comcast's possession, including video activity data and demographic data";

(5) "stop using its cable system to record, transmit, or observe video activity data about *cable subscribers* without their express written consent";

(6) "destroy all video activity data collected from *cable subscribers* through Comcast's cable system without their express written consent";

(7) "provide *cable subscribers* who request
access to their individually identifiable
subscriber information with access to all
such information gathered by Comcast
within 30 days, including video activity
data."

At least *some* (but not all) of these requested forms of
relief seek forward-looking prohibitions against future
violations of law.  But as we have explained, that alone is
not enough to classify the remedy as public injunctive relief
within the meaning of the *McGill* rule.  And unlike the public
injunctive relief sought in *McGill*, *Broughton*, and *Cruz*,
these requests on their face stand to benefit only Comcast
"cable subscribers"—*i.e.*, by definition they will only benefit
a "group of individuals similarly situated to the plaintiff."
*McGill*, 393 P.3d at 90; *see also Capriole*, 7 F.4th at 854,
2021 WL 3282092, at *13; *Clifford*, 251 Cal. Rptr. 3d at 278.
There is simply no sense in which this relief could be said to
*primarily* benefit the general public as a more diffuse whole.
*See McGill* 393 P.3d at 89–90 (relief that incidentally
benefits the public does not suffice to convert private relief
to public relief).

Moreover, it is apparent that administering any
injunctive relief of the sort sought here would entail the
consideration of the individualized claims of numerous cable
subscribers.  The relief sought here is not the equivalent of a
simple prohibition on running a false advertisement or a
mandatory injunction to obtain certain licenses or to make
additional public disclosures in advertising.  On the contrary,
each form of relief would require either consideration of
which particular consents each subscriber has or has not
given or examination of which individualized disclosures
have or have not been made.  Administering an injunction of

this sort, on this scale, is patently incompatible with the procedural simplicity envisioned by bilateral arbitration. *Stolt-Nielsen*, 559 U.S. at 685–86; *Concepcion*, 563 U.S. at 348–49. We do not construe California's *McGill* rule as purporting to insist that the right to seek *that* sort of relief is non-waivable. But to the extent that the *McGill* rule did so, it would be a much different rule from the one we confronted in *Blair*, and this broader version of the rule is preempted by the FAA.

## III

We reverse the district court's denial of Comcast's motion to compel arbitration, and we remand to the district court with instructions to grant that motion.

**REVERSED AND REMANDED.**

---

BERZON, Circuit Judge, dissenting:

The majority concludes, contrary to our precedent and to recent decisions of the California Court of Appeal, that a forward-looking injunction protecting the privacy rights of millions of cable consumers is not "public injunctive relief" under California state law. I disagree.

This case is indistinguishable from our decision in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019), and the California Court of Appeal's recent decisions in *Mejia v. DACM Inc.*, 54 Cal. App. 5th 691 (2020), and *Maldonado v. Fast Auto Loans, Inc.*, 60 Cal. App. 5th 710 (2021), all of which held that an injunction affecting the contract terms a business could offer to members of the public qualified as public injunctive relief. Here, too, Hodges requests an

injunction that would require Comcast to provide a statutorily mandated notice at the time an agreement is entered—that is, when a member of the general public is deciding whether to become a Comcast subscriber. Just as in *Blair*, *Mejia*, and *Maldonado*, the relief sought here "has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public" and is therefore public injunctive relief. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 951 (2017).

In *Blair*, the plaintiffs "entered into rent-to-own agreements" with Rent-A-Center, which "operates stores that rent household items to consumers for set installment payments." *Blair*, 928 F.3d at 822. The plaintiffs "alleged that Rent-A-Center structured its rent-to-own pricing in violation of [California] law." *Id.* In particular, the plaintiffs alleged violations of a statute that sets maximum prices that businesses may charge for rent-to-own items, in proportion to the items' actual cost. *Id.* at 823. Plaintiffs sought "to enjoin future violations of these laws." *Id.*

Obviously, the injunction requested in *Blair* would not directly benefit *every* member of the general public. It would benefit those members of the public who contemplate entering into rent-to-own agreements with Rent-A-Center or do enter into such agreements, by ensuring that they are offered terms compliant with California law. We concluded in *Blair* that the plaintiffs sought public injunctive relief. *Id.* at 831 n.3. We reasoned that "Blair seeks to enjoin future violations of California's consumer protection statutes, relief oriented to and for the benefit of the general public." *Id.*

Similarly, in *Mejia*, the plaintiff bought a used motorcycle from a dealership, Del Amo, and financed the purchase using a credit card he obtained through the dealership. *Mejia*, 54 Cal. App. 5th at 694. He alleged that

the dealership had violated a state law requiring it "to provide its customers with a *single document* setting forth all the financing terms for motor vehicle purchases made with a conditional sale contract." *Id.* at 695. The plaintiff sought "an injunction prohibiting Del Amo from selling motor vehicles 'without first providing the consumer with a single document containing all of the agreements of Del Amo and the consumer with respect to the total cost and the terms of payment for the motor vehicle.'" *Id.* at 695–96.

Del Amo maintained that the injunction requested was "private" because it would "benefit only a 'narrow group of Del Amo customers'—the class of similarly situated individuals who, like Mejia, would buy a motorcycle from Del Amo with a conditional sale contract." *Id.* at 702. The California Court of Appeal rejected that argument, reasoning that the injunction sought would force "Del Amo to cease 'selling motor vehicles in the state of California without first providing the consumer with all [mandated] disclosures . . . in a single document.'" *Id.* at 703. In other words, the relief would not be limited to "class members or some other small group of individuals" but would benefit any member of the general public who in the future considers buying a motorcycle from Del Amo. *Id.*

Finally, in *Maldonado*, the defendant lender, Fast Auto Loans, "offered loans to California consumers . . . in immediate need of cash . . . [who] have limited credit opportunities." *Maldonado*, 60 Cal. App. 5th at 713 (alteration omitted). The plaintiffs alleged that the lender "charged unconscionable interest rates" on the loans in violation of California law. *Id.* The plaintiffs requested an injunction requiring the lender, among other things, to "cease charging an unlawful interest rate on its loans exceeding $2,500." *Id.* at 715.

Analyzing whether the plaintiffs sought public injunctive relief, the California Court of Appeal began by rejecting the lender's argument that *McGill* "only applies to plaintiffs seeking to enjoin false or misleading advertising on behalf of the general public." *Id.* at 721 (emphasis omitted). The court reasoned that "California's consumer protection laws must be liberally, not narrowly, applied." *Id.* (citing *McGill*, 2 Cal. 5th at 954). California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), protects consumers from *any* "unfair" business practice, not just deceptive advertising. *McGill*, 2 Cal. 5th at 954. The "primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *Id.* (citation omitted). The Court of Appeal observed that "no case" had limited the "remedy of public injunctions" under the UCL "to false advertising claims." *Maldonado*, 60 Cal. App. 5th at 721.

The Court of Appeal also rejected the lender's argument that the injunction sought was "private" relief because it would benefit only the lender's customers and not the general public. The court reasoned,

> The requested injunction cannot be deemed private simply because Lender could not possibly . . . enter into agreements with[] every person in California. Such a holding would allow Lender to continue violating the UCL and [Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*] because consumers harmed by the unlawful practices would be unable to act as a private attorney general and seek redress on behalf of the public. It is enough that the requested relief

has the purpose and effect of protecting the
public from Lender's ongoing harm.

*Id.* at 722.

The injunction sought by Hodges includes relief that is
indistinguishable from the relief that we and the California
Court of Appeal deemed public injunctive relief in *Blair*,
*Mejia*, and *Maldonado*. Hodges seeks an injunction
requiring Comcast to "clearly and conspicuously notify
cable subscribers in writing, at the requisite times, of the
period during which it maintains their [personally
identifiable information ("PII")], including video activity
data and demographic data (under the Cable Act and UCL)."
*See* Majority op. 25. The Cable Act supplies the requisite
times: *"[a]t the time of entering into an agreement to
provide any cable service or other service to a subscriber*
and at least once a year thereafter." 47 U.S.C. § 551(a)(1)
(emphasis added). In other words, as Comcast's lawyer
stated at oral argument, the disclosure requested by Hodges
"is a term of the contract for contracting parties." Thus, the
injunction would benefit not just existing Comcast
subscribers but any member of the public who considers
entering into, or does enter into, an agreement with
Comcast—just as the injunctions in the cases discussed
above would protect members of the public who consider
contracting with or do contract with Rent-A-Center, Del
Amo, and Fast Auto Loans in the future. In all four cases,
the requested injunction would benefit the general public by
preventing the defendant business from contracting or
proposing to contract with any member of the public—not
just current customers—on unfair terms.

The majority acknowledges our binding holding in *Blair*
that an injunction preventing "Rent-A-Center from using an

unlawful pricing structure" was public injunctive relief, but it fails to compare that relief with the relief sought here. Majority op. 16. As for *Mejia* and *Maldonado*, the majority suggests those cases were wrongly decided because the relief requested "would primarily benefit the class of persons who actually purchased motorcycles" (in *Mejia*) or "who actually sign lending agreements" (in *Maldonado*), "and not the general public as a whole." Majority op. 17–18, 19. That characterization is inaccurate. As here, the requirement in *Mejia* and *Maldonado* applied before the transaction was consummated, and so applied with respect to both potential customers and actual customers. And the majority does not explain why an injunction that benefits potential *and* actual purchasers of motorcycles (or potential *and* actual borrowers) when they are considering whether to enter into a transaction does not benefit the general public; it simply asserts that conclusion. Likewise, the majority concludes with little analysis that the relief sought by Hodges regarding the privacy notice is private because it would benefit only Comcast subscribers, not "the general public as a more diffuse whole." Majority op. 26. But, again, the notice requirement applies at the point of sale and periodically thereafter and appears intended to protect the right of any potential customer—who could be anyone in California, as there are no selective criteria—to choose *not* to subscribe if the privacy term is not acceptable.

The implicit premise underlying the majority's reasoning is that the concept of public injunctive relief is confined to what the majority calls its "paradigmatic example": "an injunction against the use of false advertising." Majority op. 13. This premise rests on a fiction: Advertisements reach the public as a "diffuse whole," so an injunction barring false advertising benefits the whole, diffuse public. And conversely, this same reasoning goes, an

injunction regulating the terms a business may offer consumers in a contract is private because it only benefits those consumers who actually enter into, or are considering entering into, a contract.

The notion that advertising reaches every member of the whole, diffuse public was never true, and it is even less true in today's world of highly targeted advertising, in which a great many ads are intended for a very specific audience. Furthermore, an injunction preventing a business from publishing a false advertisement does not even directly benefit every person who would have seen the advertisement. It benefits only those consumers who would have been taken in by it—in other words, the potential buyers of the misleadingly advertised product. Yet, under the majority's logic, an injunction preventing a motorcycle dealership from posting a deceptive advertisement on its premises would be public injunctive relief, while an injunction preventing the same dealership from including an unlawful term in its proposed sale contracts would be purely private relief. That result is nonsensical. In each case, the direct beneficiaries of the injunction are a relatively specific group: consumers interested in buying motorcycles. Yet both injunctions benefit the general public because any member of the general public may at some time in the future become interested in purchasing a motorcycle and so be misled by a deceptive advertisement or by an unlawful term in a proposed contract when considering buying a motorcycle. In either context, an injunction could prevent the dealership from treating unfairly these members of the public newly considering buying a motorcycle.

Likewise, here, any member of the general public may decide to sign up with Comcast or may read the terms offered before deciding whether to sign up. As far as appears,

Comcast offers its services to the public at large, the only criteria for admission into the "customer" group being willingness to sign an agreement for services and pay the requisite service rates. And Comcast in fact reaches a large number of cable consumers in California: the record shows that as of 2014, Comcast reportedly had 2.2 million subscribers in the state, or 40 percent of the state cable market. Undoubtedly, a great many members of the general public will in the future consider contracting with, and will contract with, Comcast for cable service.

In contrast, members of the public could not freely join the group of former students in *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052 (9th Cir. 2013) (en banc). The flight school no longer operated, and the bank no longer offered student loans. *Id.* at 1056, 1061. Nor could any member of the general public choose to become an employee of the defendant software company in *Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745 (2019), or a driver for Uber in *Capriole v. Uber Technologies, Inc.*, No. 20-16030, 2021 WL 3282092 (9th Cir. Aug. 2, 2021). Surely not just anyone can walk through the doors of Quest Software, announce, "I accept your offer of employment," and start working there. And Uber requires its drivers to have one to three years of licensed driving experience and to pass a background check, among other requirements. *See Driver Requirements*, Uber, https://www.uber.com/us/en/drive/requirements/ (last visited Aug. 9, 2021). The relief sought in *Kilgore*, *Clifford*, and *Capriole* benefited a circumscribed group of people; there was no sense in which the injunctions "prohibit[ed] unlawful acts that threaten[ed] future injury to the general public." *McGill*, 2 Cal. 5th at 955.

Our court's job in deciding this question of state law is to "apply the law as [we] believe[] the California Supreme

Court would apply it." *Edgerly v. City & Cty. of San Francisco*, 713 F.3d 976, 982 (9th Cir. 2013) (citation omitted). In my view, it is highly unlikely that the California Supreme Court would limit public injunctive relief to the false advertising context. At a minimum, in keeping with the liberal construction given to California's consumer protection statutes, public injunctive relief must also include injunctions affecting the contract terms a business may offer to potential customers.[1] That was the import of our holding in *Blair*, and it is what the California Court of Appeal decided in *Mejia* and *Maldonado*. "In the absence of a controlling California Supreme Court decision, we follow decisions of the California Court of Appeal unless there is convincing evidence that the California Supreme Court would hold otherwise." *Edgerly*, 713 F.3d at 982 (internal quotation marks and citation omitted). The California Supreme Court denied petitions for review in both *Mejia* and *Maldonado*, and we have no evidence, let alone "convincing evidence," that it would disapprove those cases.

Besides drawing an arbitrary line between the public who views advertisements and the public who signs up for cable or buys motorcycles, the majority posits an additional reason why the relief sought here and in *Mejia* and *Maldonado* is private, not public. The majority maintains

---

[1] Because at least part of the relief Hodges seeks is public injunctive relief, I would affirm the district court's order denying the motion to compel arbitration. *See Blair*, 928 F.3d at 823, 831 n.3, 832 (affirming the denial of a motion to compel arbitration on the basis that some of the injunctive relief Blair sought was public injunctive relief). For present purposes, I need not and therefore do not address whether the other forward-looking injunctive relief that Hodges seeks—which would benefit future Comcast subscribers by, for example, requiring Comcast to stop collecting certain data without subscribers' consent—is also public injunctive relief. *See* Majority op. 24–26.

that "administering any injunctive relief of the form sought here would entail the consideration of the individualized claims of numerous cable subscribers." Majority op. 26; *see id.* at 22–24. I cannot see why it would. The injunction requested by Hodges would simply require Comcast to adopt new operating procedures going forward: provide a particular notice when a contract is signed, obtain consent before using its cable system to collect certain data, and so on. *See* Majority op. 24–26 (quoting complaint). No adjudicator would have to examine the claims of individual cable subscribers before entering an order like that. True, if someone were to bring an action to *enforce* the injunction, an adjudicator would need to examine the facts to determine whether the injunction had been violated, but that is also true in the false advertising context that the majority offers as a foil. *See* Majority op. 26–27 It is true in any enforcement action.

The majority has failed to provide a convincing rationale for the distinction it draws in this case between relief benefiting consumers who contract with businesses and relief benefiting consumers who are exposed to advertisements. Because the distinction is untenable and I believe it would be rejected by the California Supreme Court, I dissent. I would affirm the district court's denial of the motion to compel arbitration.

Case: 18-16394, 09/13/2021, ID: 12228826, DktEntry: 70-2, Page 40 of 71

# Uber

Sign up

## Drive



cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

# You help keep communities moving

We're finding new ways to support you.

Drivers and delivery people like you are working hard to keep communities running. You deserve strong support—from your communities, from your government, and from Uber. We're finding new ways to increase the support you receive, including working with government officials to help you get access to financial relief for lost earnings you may be eligible for, and providing you with access to more opportunities to earn.

Learn more

# Driver requirements

Uber is a great way to be your own boss and earn great money. From a commercial license to a car, Uber can help you every step of the way.

**Sign up to drive**



Cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

# Driver requirements details



## Minimum requirements

There are a few minimum requirements to meet before you can sign up to drive with Uber:

- Meet the minimum age to drive in your city

- Have at least one year of licensed driving experience in the US (3 years if you are under 23 years old)
- Have a valid US driver's license
- Use an eligible 4-door vehicle



## Required documents

For your next step, share the following documentation:

- A valid US driver's license
- Proof of residency in your city, state, or province
- Proof of vehicle insurance if you plan to drive your own car
- A driver profile photo
  - Must be a forward-facing, centered photo including the driver's full face and top of shoulders, with no sunglasses
  - Must be a photo only of the driver with no other subject in the frame, well-lit, and in focus; it cannot be a driver's license photo or other printed photograph

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021



## Driver screening

After signing up, you can complete a screening online. It will review your driving record and criminal history.

# It's easy to get started

## 1. Sign up

Tell us about yourself and your car, or get a car if you need one. Vehicle requirements vary by region, so we'll show you what's needed.

Sign up to drive

## 2. Share required documents

Next, submit copies of your license, registration, and proof of insurance, plus some information for a background check.

### 3. Get the app and go

Once you're on the Uber platform, log in to the app and you can start making money.



# Local vehicle requirements

In addition to the minimum requirements above, each city has its own regulations for vehicles.

Learn more



## More ways to earn

Grab your bike, scooter, or car and boost your earnings by making deliveries with Uber. Enjoy a flexible schedule and quick earning potential all while cruising around town.

Deliver with Uber



## Rent a car

Need a car? Get one at an affordable rate. Check out options that are available exclusively to Uber partners.

See your options

# Ready to make money?

The first step is to sign up.

Sign up to drive

The material provided on this web page is intended for informational purposes only and may not be applicable in your country, region, or city. It is subject to change and may be updated without notice.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

Uber

Visit Help Center



Do not sell my info (California)

## Company

About us

Our offerings

Newsroom

Investors

Blog

Careers

AI

Gift cards

## Products

Ride

Drive

Deliver

Eat

Uber for Business

Uber Freight

## Global citizenship

Safety

Diversity and Inclusion

## Travel

Airports

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021



Cities

English

Wichita

GET IT ON
Google Play

Download on the
App Store

© 2021 Uber Technologies Inc.

Privacy                    Accessibility                    Terms

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021



Select jurisdiction:    Select language:

United States ▾      English ▾

Last modified: 8/9/2021

# Uber Privacy Notice



Cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

[I. Introduction](#) / [II. Overview](#) / [III. Data collections and uses](#) / [IV. Choice and transparency](#) / [V. Updates to this notice](#)

# I. Introduction

When you use Uber, you trust us with your personal data. We're committed to keeping that trust. That starts with helping you understand our privacy practices.

This notice describes the personal data we collect, how it's used and shared, and your choices regarding this data. We recommend that you read this along with our privacy overview, which highlights key points about our privacy practices.

Download previous version

# II. Overview

## A. Scope

*This notice applies to users of Uber's services anywhere in the world, including users of Uber's apps, websites, features, or other services.*

This notice describes how Uber and its affiliates collect and use personal data. This notice applies to all users of our apps, websites, features, or other services anywhere in the world, unless covered by a separate privacy notice, such as the Uber Freight Privacy Notice or Careem Privacy Policy. This notice specifically applies to:

- **Riders:** individuals who request or receive transportation, including those who receive transportation requested by another individual.

- **Drivers:** individuals who provide transportation to Riders individually or through partner transportation companies.

- **Delivery recipients:** individuals who request or receive food, or other products and services, including via Uber Eats, Postmates and Cornershop

- **Delivery persons:** individuals who provide delivery services, including via Uber Eats, Postmates and Cornershop

This notice also governs Uber's other collections of personal data in connection with its services. For example, we may collect the contact information of individuals who use accounts owned by Uber for Business customers, or of owners or employees of restaurants or other merchants; personal data of those who start but do not complete applications to be drivers or delivery persons; or other personal data in connection with our mapping technology and features.

All those subject to this notice are referred to as "users" in this notice.

In addition, please note the following:

- **For users in Argentina:** The Public Information Access agency, in its role of Regulating Body of Law 25.326, is responsible for receiving complaints and reports presented by any data subjects who believe their rights have been impacted by a violation of the local data protection regulation.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483, archived on September 3, 2021

- **For users in Brazil**: Please see here for information regarding Uber's privacy practices required under Brazil's General Data Protection Law (*Lei Geral de Proteção de Dados – LGPD*).

- **For California users**: Information regarding Uber's privacy practices related to the California Consumer Privacy Act (CCPA) is available here.

- **For users in Colombia**: This notice also applies for the lessors and lessees. For the purposes of this notice, lessors will be considered drivers and lessees will be considered riders.

- **For users in Mexico**: Please see here for information regarding Uber's privacy practices required under Mexico's Mexican Personal Data Protection Law (*Ley Federal de Protección de Datos Personales en Posesión de los Particulares*).

- **For users in Nigeria**: Uber does not process the personal data of users in Nigeria for purposes of the legitimate interests of Uber or other parties. Instead, Uber processes such personal data on the grounds that it is necessary to fulfill our obligations to users under our Terms of Use or other agreements with users, or based on users' consent.

- **For users in South Korea**: Please see here for information about Uber affiliate UT LLC's privacy practices.

- **For Guest Users**: The personal data of those who order or receive trips or deliveries via partner websites or apps (such as when ordering from a restaurant or other merchant), or arranged by other account owners (collectively "Guest Users") is used solely to provide such trips, deliveries, or other services requested through a third party, and for purposes of safety and security, customer support, research and development, enabling communication between users, and in connection with legal proceedings and requirements, each as described in "How we use personal data" below. Guest User personal data may be shared with third parties for these purposes. Such data may be associated with, and accessible by, the owner of that account. This specifically includes Guest Users who receive rides/deliveries ordered by owners of Uber Health, Uber Central, Uber Direct or Uber for Business accounts, or who receive rides or deliveries ordered by friends, family members or others. To submit questions, comments or complaints regarding Guest User data, or to submit requests regarding such data, please visit here.

Our practices are subject to applicable laws in the places in which we operate. This means that we engage in the practices described in this notice in a particular country or region only if permitted under the laws of those places. Please contact us here or through the addresses below with any questions regarding our practices in a particular country or region.

## B. Data controller and transfer

*Uber B.V. and Uber Technologies Inc. are the data controllers for the personal data collected in connection with use of Uber's services in the European Economic Area, the United Kingdom and Switzerland.*

*Uber Technologies Inc. is the data controller for the personal data collected in connection with use of Uber's services everywhere else.*

cited in Hodges v. Comcast Cable Communications, LLC No. 19-16483 archived on September 3, 2021

Uber B.V. (Mr. Treublaan 7, 1097 DP, Amsterdam, the Netherlands) and Uber Technologies Inc. (1515 3rd Street, San Francisco, CA, 94158, USA) are the data controllers for the personal data collected in connection with use of Uber's services in the European Economic Area, the United Kingdom and Switzerland. If you're a driver in the UK, the Uber entity holding the relevant PHV operator license is a controller for complying with licensing requirements.

Uber Technologies Inc. is the data controller for the personal data collected in connection with use of Uber's services everywhere else.

Uber operates, and processes personal data, globally. We may also transfer such data to countries other than the one where our users live or use Uber's services. We do so in order to fulfill our agreements with users, such as our Terms of Use, or based on users' prior consent, adequacy decisions for the relevant countries, or other transfer mechanisms as may be available under applicable law, such as the Standard Contractual Clauses.

Questions, comments, and complaints about Uber's data practices can be submitted here. You may also use this form to submit a question to Uber's Data Protection Officer.

# III. Data collections and uses

## A. The data we collect

*Uber collects personal data:*

- *provided by users to Uber, such as during account creation*

- *created during use of our services, such as location, app usage, and device data*

- *from other sources, such as other users or account owners, business partners, vendors, insurance and financial solution providers, and governmental authorities*

The following personal data is collected by or on behalf of Uber:

**1. Data provided by users.** This includes:

- **User profile:** We collect data when users create or update their Uber accounts. This may include their name, email, phone number, login name and password, address, profile picture, payment or banking information (including related payment verification information), driver's license and other government identification documents (which may indicate document numbers as well as birth date, gender, and photo). This also includes vehicle or insurance information of drivers and delivery persons, emergency contact information, user settings, and evidence of health or fitness to provide services using Uber apps.

  This also includes gender and/or occupation (when required for certain Uber services or programs, such as Uber Cash or features that enable women to provide services or receive services to/from other women).

cited in Hodges v. Comcast Cable Communications, LLC No. 19-16483 argued on September 3, 2021

We may use the photos submitted by users to verify their identities, such as through facial verification technologies. For more information, please see the section titled "**How we use personal data.**"

- **Background check and identity verification (drivers and delivery persons)**. This may include information such as driver history or criminal record (where permitted by law), license status, known aliases and prior addresses, and right to work. This information may be collected by an authorized vendor on Uber's behalf. We also verify the identities of riders, and of delivery recipients who request alcohol delivery.

- **Demographic data:** We may collect demographic data about users, including through user surveys. In some countries, we may also receive demographic data about users from third parties.

  We may also infer demographic data from other data collected from users. For example, where necessary to enable features that allow women to provide or receive services from other women, we may infer gender using their first name. In such cases, we enable users to change their gender if necessary via in-app settings.

- **User content:** We collect the data submitted by users when they contact Uber customer support (including at Uber Greenlight Hubs, or via videoconferencing tools), provide ratings or compliments for other users, restaurants or merchants, or otherwise contact Uber. This may include feedback, photographs or other recordings collected by users, including audio or video recordings (such as from dashcams) submitted by users in connection with customer support. This also includes metadata relating to the method you use to communicate with Uber.

- **Travel information:** We collect travel itinerary information, including the times and dates of upcoming flight, lodging or car rental reservations, from users of our Uber Travel feature. We collect such information: (i) when users manually input their information into an Uber Travel itinerary; or (2) if authorized by users to access their Gmail accounts, from traveled-related email confirmations. If so authorized, Uber will only access users' Gmail accounts to collect travel itinerary information to enable the Uber Travel feature, and will adhere to Google's **API Services User Data Policy**, including the limitations on use of data collected from users' Gmail accounts.

2. **Data created during use of our services.** This includes:

- **Location data (driver and delivery person):** We collect drivers' and delivery persons' precise or approximate location data, including to enable rides and deliveries, to enable ride/delivery tracking and safety features, to prevent and detect fraud, and to satisfy legal requirements. Uber collects this data when the Uber app is running in the foreground (app open and on-screen) or background (app open but not on-screen) of their mobile device.

- **Location data (riders and delivery recipients).** We collect riders' and delivery recipients' precise or approximate location data to enable and enhance use of our apps, including to improve pick-ups, facilitate deliveries, enable safety features, and prevent and detect fraud. Please see our Rider Location Help page for detailed information on how we use this data.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

We collect such data from users' mobile devices if they enable us to do so. (See "**Choice and transparency**" below for information on how riders and delivery recipients can enable location data collection). Uber collects such data from the time a ride or delivery is requested until it is finished (and may indicate such collection via an icon or notification on your mobile device depending on your device's operating system), and any time the app is running in the foreground (app open and on-screen) of their mobile device.

Riders and delivery recipients may use the Uber apps without enabling Uber to collect precise location data from their mobile devices. However, this may affect features in the Uber apps. For example, a user who has not enabled location data collection will have to manually enter their pick-up address. In addition, the location data collected from a driver during a trip will be linked to the rider's account, even if the rider has not enabled location data to be collected from their device, including for purposes of receipt generation, customer support, fraud detection, insurance, and litigation.

- **Transaction information:** We collect transaction information related to the use of our services, including the type of services requested or provided, order details, payment transaction information (such as a restaurant's or merchant's name and location and amount of transaction), delivery information, date and time the service was provided, amount charged, distance traveled, and payment method. Additionally, if someone uses your promotion code, we may associate your name with that person.

- **Usage data:** We collect data about how users interact with our services. This includes data such as access dates and times, app features or pages viewed, app crashes and other system activity, and type of browser. We may also collect data regarding the third-party sites or services used before interacting with our services, which we use for marketing. (Please see "**How We Use Data**" below for more information on how we market our services to users).

In some cases, we collect this data through cookies, pixels, tags, and similar tracking technologies that create and maintain unique identifiers. To learn more about these technologies, please see our Cookie Notice.

- **Device data:** We may collect data about the devices used to access our services, including the hardware models, device IP address or other unique device identifiers, operating systems and versions, software, preferred languages, advertising identifiers, device motion data, and mobile network data.

- **Communications data:** We enable users to communicate with each other and Uber through Uber's mobile apps and websites. For example, we enable drivers and riders, and delivery persons and delivery recipients, to call, text, or send other files to each other (generally without disclosing their telephone numbers to each other). To provide this service, Uber receives some data regarding the calls, texts, or other communications, including the date and time of the communications and the content of the communications. Uber may also use this data for customer support services (including to resolve disputes between users), for safety and security purposes, to improve our services and features, and for analytics.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

- **Safety recordings**: In certain jurisdictions, and where permitted by law, users can record the audio and/or video of their trips through an in-app feature or using a dashcam. In app recordings are encrypted and stored on users' devices, and are only shared with Uber if submitted to customer support by the users in connection with safety incidents. Please see here more information.

**3. Data from other sources.** These include:

- Users participating in our referral programs. For example, when a user refers to another person, we receive the referred person's personal data from that user.

- Uber account owners who request services for or on behalf of other users, or who enable such users to request or receive services through their accounts. This includes owners of Uber for Business accounts.

- users or others providing information in connection with claims or disputes.

- Uber business partners through which users create or access their Uber account, such as payment providers, social media services, or apps or websites that use Uber's APIs or whose APIs Uber uses.

- Uber business partners in connection with debit or credit cards issued by a financial institution in partnership with Uber to the extent disclosed in the terms and conditions for the card.

- vendors who help us verify users' identity, background information, and eligibility to work, or who screen users in connection with sanctions, anti-money laundering, or know-your-customer requirements

- insurance, vehicle, or financial services providers for drivers and/or delivery persons

- partner transportation companies (for drivers or delivery persons who use our services through an account associated with such a company)

- publicly available sources

- marketing service providers or data resellers whose data Uber uses for marketing or research

- law enforcement officials, public health officials, and other government authorities

Uber may combine the data collected from these sources with other data in its possession.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

# B. How we use personal data

*Uber uses personal data to enable reliable and convenient transportation, delivery, and other products and services. We also use such data:*

- *to enhance the safety and security of our users and services*

- *for customer support*

- *for research and development*

- *to enable communications between users*

- *to send marketing and non-marketing communications to users*

- *in connection with legal proceedings*

*Uber does not sell or share user personal data with third parties for their direct marketing, except with users' consent.*

We use personal data we collect:

1. **To provide our services.** Uber uses data to provide, personalize, maintain, and improve our services.

This includes using data to:

- create/update accounts

- enable transportation and delivery services (such as using location data to facilitate a pick up or delivery), features that involve data sharing (such as fare splitting, ETA sharing, and ratings and compliments), and accessibility features to facilitate use of our services by those with disabilities

- process payments

- track and share the progress of rides or deliveries

- create Uber travel itineraries and offer related services, such as rides to the airport, rental car reservations, or food deliveries.

- personalize users' accounts. We may, for example, present an Uber Eats user with personalized restaurant or food recommendations based on their prior orders. Please see the section of this notice titled "**Choice and transparency**" to learn how to object to this use of personal data.

- facilitate insurance, vehicle, invoicing, or financing solutions

- perform necessary operations to maintain our services, including to troubleshoot software bugs and operational problems; to conduct data analysis, testing, and research; and to monitor and analyze usage and activity trends.

Uber performs the above activities, including the collection and use of location data for purposes of these activities, on the grounds that they are necessary to fulfill our obligations to users under our

Cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

Terms of Use or other agreements with users.

**2. Safety and security.** We use personal data to help maintain the safety, security, and integrity of our services and users. This includes:

- verifying users' identity and eligibility to provide transportation or deliveries, including through reviews of background checks, where permitted by law, to help prevent use of our services by unsafe drivers and/or riders.

  In certain regions, this includes Uber's <u>Real-Time ID Check</u> feature, which prompts drivers and delivery persons to share a selfie before going online to help ensure that the driver or delivery person using the app matches the Uber account we have on file. Where permitted by law, this also includes performing facial verification of photographs submitted by users, or collected from public databases, to prevent identity-borrowing or to verify users' identities.

- using data from drivers' or delivery persons' devices to detect unsafe driving behavior such as speeding or harsh braking and acceleration, and to inform them of safer driving practices. We also use data from delivery persons' devices to verify the type of vehicles they used to provide deliveries.

- using device, location, user profile, usage, and other data to prevent, detect, and combat fraud. This includes identifying fraudulent accounts or uses of our services, preventing use of our services by unauthorized drivers or delivery persons, verifying user accounts and entities in connection with certain payment methods, and preventing and combating unauthorized access to users' accounts.

- using user ratings, reported incidents, and other feedback to encourage compliance with our <u>Community Guidelines</u> and as grounds for deactivating users with low ratings or who otherwise violated such guidelines in certain countries.

- sharing information regarding serious driver or delivery person safety incidents or compliance with local regulations with third parties, including other companies who enable users to request or provide rides or delivery services, or intermediaries who collect and report such information for multiple companies, to prevent drivers or delivery persons who may pose a safety risk to the platform or its users from using Uber's or those other companies' services. We may also share with third parties, including those affected by such incidents, whether the incidents result in account deactivation.

- using ratings, usage and other data to prevent matching of riders and drivers for whom there is higher risk of conflict (for instance, because one user previously gave the other a one-star rating).

Uber performs the above activities on the grounds that they are necessary to fulfill our obligations to users under our Terms of Use or other agreements with users, and/or for purposes of the legitimate safety and security interests of Uber or other parties, including users and members of the general public.

Used in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2024

**3. Customer support.** Uber uses the information we collect (which may include call recordings) to provide customer support, including to investigate and address user concerns and to monitor and improve our customer support responses and processes.

Uber performs the above activities on the grounds that they are necessary to fulfill our obligations to users under our Terms of Use or other agreements with users.

**4. Research and development.** We may use personal data for testing, research, analysis, product development, and machine learning to improve the user experience. This helps us make our services more convenient and easy-to-use, enhance the safety and security of our services, and develop new services and features.

Uber performs the above activities on the grounds that they are necessary to fulfil our obligations to users under our Terms of Use or other agreements with users in improving our existing services and features, or for purposes of Uber's legitimate interests developing new services and features.

**5. Enabling communications between users.** For example, a driver may message or call a rider to confirm a pickup location, a rider may contact a driver to retrieve a lost item, or a restaurant or delivery person may call a delivery recipient with information about their order.

Uber performs the above activities on the grounds that they are necessary to fulfill our obligations to users under our Terms of Use or other agreements with users.

**6. Marketing.** Uber may use personal data to market our services to users. This includes sending users communications about Uber services, features, promotions, sweepstakes, studies, surveys, news, updates, and events. We may do so through various methods, including email, text messages, push notifications, in-app communications and ads, and ads on third party platforms.

We may also inform users about products and services offered by Uber partners. For example, we may provide recommendations, promotions, or ads for Uber partners based on users' past delivery orders. Although we inform users about products and services offered by Uber partners, **we do not sell users' personal data to, or share it with, such partners or others for purposes of their own direct marketing or advertising, except with users' consent.**

We may use the data we collect, including in combination with advertising partners' data, to personalize and improve the marketing communications (including ads) that we send on and off Uber's apps and websites, including based on user location, use of Uber's services, and user preferences and settings. For example, we share user data (such as hashed email address, usage information, and device or user identifiers) with Facebook and TikTok to personalize and improve our ads for Uber's services.

For information about how to opt out of certain marketing communications (including ads) from Uber and its advertising partners, please see the section titled "**Marketing choices**."

We may also send users communications regarding elections, ballots, referenda, and other political and notice processes that relate to our services. For example, Uber has notified some users by email of ballot measures or pending legislation relating to Uber's services in those users' areas.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-cv-6483 archived on September 3, 2021

Uber performs the above activities on the grounds that they are necessary for purposes of Uber's legitimate interests in informing users about Uber services and features or those offered by Uber partners, or on the basis of user consent. See the sections titled "**Choice and transparency**" and "**Marketing choices**" for information on your choices regarding Uber's use of your data for marketing.

**7. Non-marketing communications.** Uber may use personal data to generate and provide users with receipts; inform them of changes to our terms, services, or policies; or send other communications that aren't for the purpose of marketing the services or products of Uber or its partners.

Uber performs the above activities on the grounds that they are necessary to fulfill our obligations to users under our Terms of Use or other agreements with users, or for purposes of Uber's and it's users legitimate interests in informing users about events that may have an impact on how they can use Uber services.

**8. Legal proceedings and requirements.** We may use personal data to investigate or address claims or disputes relating to use of Uber's services, to satisfy requirements under applicable laws, regulations, or operating licenses or agreements, or pursuant to legal process or governmental request, including from law enforcement.

Uber performs the above activities on the grounds that they are necessary for purposes of Uber's legitimate interests in investigating and responding to claims and disputes relating to use of Uber's services and features, and/or necessary for compliance with applicable legal requirements.

**9. Automated decision-making**

We use personal data to make automated decisions relating to use of our services. This includes:

- enabling dynamic pricing, in which the price of a ride, or the delivery fee for Uber Eats orders, is determined based on constantly varying factors such as the estimated time and distance, the predicted route, estimated traffic, and the number of riders and drivers using Uber at a given moment.

- matching available drivers and delivery persons to users requesting services. Users can be matched based on availability, proximity, and other factors such as likelihood to accept a trip based on their past behavior or preferences. Please see here for further information about our matching process.

- determining user ratings, and deactivating users with low ratings. In the European Union or where otherwise required by law, such deactivation occurs only after human review and/or the possibility to appeal. For more information about how ratings are determined and used, please see here for rider ratings, here for driver ratings, and here for delivery person ratings. Please also see the section below titled "**Ratings look-up**" for further information.

- flagging users who are identified as having engaged in fraud, unsafe activity, or other activities that may harm Uber, its users, and others. In some cases, such as when a user is determined to be abusing Uber's referral program or has submitted fraudulent documents, such behavior may result in automatic deactivation, or in the European Union or where otherwise required by law, deactivation after human review.

cited in Hodgetts v. Comcast Cable Communications, LLC 19-16483 archived on September 3, 2021

- using driver location information, and communications between riders and drivers, to identify cancellation fees earned or induced through fraud. For example, if we determine by using such information that a driver is delaying a rider pickup in order to induce a cancellation, we will not charge the rider a cancellation fee and will adjust the amounts paid to the driver to omit such a fee. To object to such an adjustment, please contact Uber customer support.

- Using driver data (such as location, rating and gender) and rider data (such as rating, origin and destination) to help avoid pairings of users that may result in increased risk of conflict.

Click the links in this section for more information about these processes. To object to a deactivation resulting from these processes, please contact Uber customer support.

Uber performs the above activities on the grounds that they are necessary to fulfill our obligations to users under our Terms of Use or other agreements with users, or on the grounds that they are necessary for purposes of the legitimate interests of Uber, its users and others.

## C. Cookies and third-party technologies

*Uber and its partners use cookies and other identification technologies on our apps, websites, emails, and online ads for purposes described in this notice, and* Uber's Cookie Notice.

Cookies are small text files that are stored on browsers or devices by websites, apps, online media, and advertisements. Uber uses cookies and similar technologies for purposes such as:

- authenticating users

- remembering user preferences and settings

- determining the popularity of content

- delivering and measuring the effectiveness of advertising campaigns

- analyzing site traffic and trends, and generally understanding the online behaviors and interests of people who interact with our services

We may also allow others to provide audience measurement and analytics services for us, to serve advertisements on our behalf across the Internet, and to track and report on the performance of those advertisements. These entities may use cookies, web beacons, SDKs, and other technologies to identify the devices used by visitors to our websites, as well as when they visit other online sites and services.

Please see our Cookie Notice for more information regarding the use of cookies and other technologies described in this section.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

# D. Data sharing and disclosure

*Some of Uber's services and features require that we share personal data with other users or at a user's request. We may also share such data with our affiliates, subsidiaries, and partners, for legal reasons or in connection with claims or disputes.*

Uber may share personal data:

## 1. With other users

This includes sharing:

- riders' first name, rating, and pickup and/or dropoff locations with drivers

- riders' first name with other riders in a carpool trip. Riders in carpool trips may also see the dropoff location of the other riders.

- delivery recipients' first name, delivery address, and order information with their delivery person and restaurant or merchant. We may also share ratings and feedback, or other information to the extent required by law, with the restaurant partner and delivery person.

- for drivers and delivery persons, we may share data with the rider(s), delivery recipient(s) and restaurants or merchants, including name and photo; vehicle make, model, color, license plate, and vehicle photo; location (before and during trip); average rating provided by users; total number of trips; period of time since they signed up to be a driver or delivery person; contact information (if permitted by applicable laws); and driver or delivery person profile, including compliments and other feedback submitted by past users.

  We also provide riders and delivery recipients with receipts containing information such as a breakdown of amounts charged, driver or delivery person first name, photo, and route map. We also include other information on those receipts if required by law.

- for those who participate in Uber's referral program, we share certain personal data of referred users, such as trip count, with the user who referred them, to the extent relevant to determining the referral bonus.

## 2. At the user's request

This includes sharing data with:

- **Other people at the user's request**. For example, we share a user's ETA and location with a friend when requested by that user, or a user's trip information when they split a fare with a friend.

- **Uber business partners.** For example, if a user requests a service through a partnership or promotional offering made by a third party, Uber may share certain data with those third parties. This may include, for example, other services, platforms, apps, or websites that integrate with our APIs; vehicle suppliers or services; those with an API or service with which we integrate; restaurants, merchants or other Uber business partners and their users in connection with promotions, contests, or specialized services.

- **Emergency services:** We offer features that enable users to share their data with police, fire, and ambulance services in the event of an emergency or after certain incidents. For more information, please see the sections below titled "**Choice and Transparency**" and "**Emergency Data Sharing**".

## 3. With the general public

Questions or comments from users submitted through public forums such as Uber blogs and Uber social media pages may be viewable by the public, including any personal data included in the questions or comments submitted by a user.

## 4. With the Uber account owner

If a user requests transportation or places an order using an account owned by another party, we may share their order or trip information, including location data, with the owner of that account. This occurs, for example, when:

- a rider uses their employer's Uber for Business profile, such as when they take trips arranged through Uber Central

- a driver or delivery person uses an account owned by or associated with an Uber partner transportation company or restaurant

- a rider takes a trip arranged by a friend or under a Family profile

- a delivery person acts as a substitute (UK only)

## 5. With Uber subsidiaries and affiliates

We share personal data with our subsidiaries and affiliates to help us provide our services or conduct data processing on our behalf. For example, Uber processes and stores such data in the United States on behalf of its international subsidiaries and affiliates.

## 6. With Uber service providers and business partners

Uber provides personal data to vendors, consultants, marketing partners, research firms, and other service providers or business partners. These include:

- payment processors and facilitators

- background check and identity verification providers

- cloud storage providers

- Google, in connection with the use of Google Maps in Uber's apps (see Google's privacy policy for information on their collection and use of data)

- social media companies, including Facebook and TikTok, in connection with Uber's use of their tools in Uber's apps and websites (see Facebook's and TikTok's privacy policies for information on their collection and use of data)

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

- Marketing partners and marketing platform providers, including social media advertising services, advertising networks, third-party data providers, and other service providers to reach or better understand our users and measure advertising effectiveness

- research partners, including those performing surveys or research projects in partnership with Uber or on Uber's behalf

- vendors that assist Uber to enhance the safety and security of its apps

- consultants, lawyers, accountants, and other professional service providers

- insurance and financing partners

- airports

- providers of bike and scooters that can be rented through Uber apps, such as Lime

- restaurants, grocery stores and other merchants from whom delivery recipients place orders, as well as partners and/or their point of sale providers, including for order fulfillment, delivery, communications and marketing purposes

- third-party vehicle suppliers, including fleet and rental partners

## 7. For legal reasons or in the event of a dispute

Uber may share users' personal data if we believe it's required by applicable law, regulation, operating license or agreement, legal process or governmental request, or where the disclosure is otherwise appropriate due to safety or similar concerns.

This includes sharing personal data with law enforcement officials, public health officials, other government authorities, airports (if required by the airport authorities as a condition of operating on airport property), or other third parties as necessary to enforce our Terms of Service, user agreements, or other policies; to protect Uber's rights or property or the rights, safety, or property of others; or in the event of a claim or dispute relating to the use of our services. In the event of a dispute relating to use of another person's credit card, we may be required by law to share your personal data, including trip or order information, with the owner of that credit card.

For more information, please see Uber's Guidelines for Law Enforcement Authorities - United States, Guidelines for Law Enforcement Authorities - Outside the US, and Guidelines for Third Party Data Requests and Service of Legal Documents.

This also includes sharing personal data with others in connection with, or during negotiations of, any merger, sale of company assets, consolidation or restructuring, financing, or acquisition of all or a portion of our business by or into another company.

## 8. With consent

Uber may share a user's personal data other than as described in this notice if we notify the user and they consent to the sharing.

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

## E. Data retention and deletion

*Uber retains user data for as long as necessary for the purposes described above.*

*Users may request deletion of their accounts at any time. Uber may retain user data after a deletion request due to legal or regulatory requirements or for reasons stated in this policy.*

Uber retains user data for as long as necessary for the purposes described above. This means that we retain different categories of data for different periods of time depending on the type of data, the category of user to whom the data relates, and the purposes for which we collected the data.

Users may request deletion of their account at any time through the Settings › Privacy menus in the Uber app, or through Uber's website (riders and delivery recipients here; drivers and delivery persons here).

Following an account deletion request, Uber deletes the user's account and data, unless they must be retained due to legal or regulatory requirements, for purposes of safety, security, and fraud prevention, or because of an issue relating to the user's account such as an outstanding credit or an unresolved claim or dispute. Because we are subject to legal and regulatory requirements relating to drivers and delivery persons, this generally means that we retain their account and data for a minimum of 7 years after a deletion request. For riders and delivery recipients, their data is generally deleted within 90 days of a deletion request, except where retention is necessary for the above reasons.

# IV. Choice and transparency

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

*Uber enables users to access and/or control data that Uber collects, including through:*

- *privacy settings*

- *device permissions*

- *in-app ratings pages*

- *marketing choices*

*Uber also enables users to request access to or copies of their data, changes or updates to their accounts, or deletion of their accounts, or that Uber restricts its processing of user personal data.*

## 1. Privacy settings

The Settings › Privacy menu in the Uber app allows riders and delivery recipients to set or update their preferences regarding location data collection and sharing, emergency data sharing, and notifications.

- **Location data collection (riders and delivery recipients)**

Riders and delivery recipients can enable/disable Uber to collect location data from their mobile devices through their device settings, which can be accessed via the Settings › Privacy ›

Location menu.

- **Share Live Location (Riders)**

Riders can enable/disable Uber to share their real-time location data from their mobile devices with their drivers through their device settings, which can be accessed via the Settings > Privacy > Location menu.

- **Emergency Data Sharing**

Riders may enable Uber to share real-time location data from their mobile devices with emergency police, fire, and ambulance services. Such data may include approximate location at the time the emergency call was placed; the car's make, model, color, and license plate information; the rider's name and phone number; pickup and dropoff locations; and the driver's name.

Riders may enable/disable this feature via the Settings > Privacy > Location menu, or the Safety Center.

Drivers and delivery persons can also enable/disable Emergency Data Sharing via the App settings > Emergency Data Sharing menu, or the Safety Toolkit.

- **Notifications: account and trip updates**

Uber provides users with trip status notifications and updates related to activity on their account. These notifications are a necessary part of using the Uber app and cannot be disabled. However, users may choose the method by which they receive these notifications through the Settings > Privacy menu.

- **Notifications: discounts and news**

Users may enable Uber to send push notifications about discounts and news from Uber. Push notifications may be enabled or disabled through the Settings > Privacy menus in the Uber app.

- **Communications from restaurants and merchants**

Users may opt-in to receive communications from certain restaurants while placing an order in the Uber Eats app. Those who opt-in may choose to cease receiving such communications through the Settings > Account > Data Sharing menus in the Uber Eats app.

## 2. Device permissions

Most mobile device platforms (iOS, Android, etc.) have defined certain types of device data that apps cannot access without the device owner's permission, and these platforms have different methods for how that permission can be obtained. Please check the available settings on your device or check with your provider.

## 3. In-app ratings pages

After every trip, drivers and riders are able to rate each other on a scale from 1 to 5. An average of those ratings is associated with a user's account and is displayed to other users for whom they provide or

receive services. For example, rider ratings are available to drivers from whom they request transportation, and driver ratings are available to their riders.

This 2-way system holds everyone accountable for their behavior. Accountability helps create a respectful, safe environment for drivers and riders.

Riders can see their average rating in the main menu of the Uber app.

Drivers can see their average rating after tapping their profile photo in the Uber Driver app.

Delivery persons may also be rated by delivery recipients, restaurants and merchants. Click here for more information.

## 4. Marketing choices

Users may opt out of certain marketing communications (including ads) and use of their data for marketing in the following ways:

- **Ad settings:** These settings enable users to choose whether their data is shared with Uber's advertising partners to deliver personalized ads, and/or to measure the effectiveness of such ads.

- **Marketing emails and messages:** To opt out of receiving marketing emails from Uber, or for instructions on how to set your preferences regarding whether to receive marketing SMS or push notifications from Uber, click here. Users may also opt out of receiving emails and other messages from Uber by following the unsubscribe instructions in those messages. We may still send users who have opted out non-promotional communications, such as receipts for rides or information about their account.

- **Cookies and related technologies:** For information on how to opt out of personalized ads using cookies and related technologies, please see our Cookie Notice.

- **Uber Eats ads:** Uber Eats users can opt out of certain personalized ads from Uber's advertising partners here. Users who opt out may still see ads, but they will be less relevant.

## 5. User personal data requests

Uber provides users with a variety of ways to learn about, control, and submit questions and comments about Uber's handling of their personal data.

- **Accessing data:** Users can access data including their profile data and trip or order history through the Uber apps or via Uber's website. Users can also use our Explore Your Data feature to view an online summary of information about their account, such as number of trips or orders, rating, rewards status, and number of days since they've been an Uber user. Users can also request access to their data here.

- **Receiving data:** Users can request a copy of their personal data using our Download Your Data tool. For an overview of the data available through that tool, please click here. Users may also request a copy of their data here.

Exhibit G cited in Hodges v. Comcast Cable Communications, LLC No. 19-16483 archived on September 3, 2021

- **Changing or updating data:** Users can edit the name, phone number, email address, payment method, and photo associated with their account through the Settings menu in Uber's apps or driver portal. Users may also request to update or correct their data here.

- **Deleting data:** Users may request deletion of their account at any time through the Settings › Privacy menus in the Uber app, or through Uber's website (riders and delivery recipients here; drivers and delivery persons here).

- **Objections, restrictions, and complaints:** Users may request that we stop using all or some of their personal data, or that we limit our use of their data. This includes objecting to our use of personal data that is based on Uber's legitimate interests. Uber may continue to process data after such objection or request to the extent required or permitted by law.

  In addition, depending on their location, users may have the right to file a complaint relating to Uber's handling of their personal data with the data protection authority in their country. For example, users in the European Union and South America may submit such requests to the data protection authorities in the country in which they live.

Users may submit the above requests here.

# V. Updates to this notice

*We may occasionally update this notice.*

We may occasionally update this notice. If we make significant changes, we will notify users in advance of the changes through the Uber apps or through other means, such as email. We encourage users to periodically review this notice for the latest information on our privacy practices.

Use of our services after an update constitutes consent to the updated notice to the extent permitted by law.

*cited in Hodges v. Comcast Cable Communications, LLC*
*No. 19-16483 archived on September 3, 2021*

# Return to Legal Hub→

Uber

Visit Help Center

cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

Do not sell my info (California)

## Company

About us

Our offerings

Newsroom

Investors

Blog

Careers

AI

Gift cards

## Products

Ride

Drive

Deliver

Eat

Uber for Business

Uber Freight

## Global citizenship

Safety

Diversity and Inclusion

## Travel

Airports

Cities

(64 of 68)



cited in Hodges v. Comcast Cable Communications, LLC
No. 19-16483 archived on September 3, 2021

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

    ►    Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

    ►    The proceeding involves a question of exceptional importance; or

    ►    The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)**    **Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)**    **Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)**    **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                     **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*