**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| BRANDON HODGES,<br>　　　　　　*Plaintiff-Appellee*,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS,<br>LLC, a Delaware limited liability<br>company,<br>　　　　　　*Defendant-Appellant.* | No. 19-16483<br><br>D.C. No.<br>4:18-cv-01829-<br>HSG<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted June 1, 2020
Portland, Oregon

Filed September 10, 2021
Amended December 23, 2021

Before:  Marsha S. Berzon, Daniel P. Collins, and
Lawrence VanDyke, Circuit Judges.

Order;
Opinion by Judge Collins;
Dissent by Judge Berzon

# SUMMARY[*]

### Arbitration

The panel filed (1) an order denying a petition for panel rehearing, denying on behalf of the court a petition for rehearing en banc, and replacing a dissenting opinion with an amended dissent; and (2) an amended dissent.

In the majority opinion, which remained unchanged, the panel reversed the district court's order denying Comcast Cable Communications, LLC's motion to compel arbitration under the Federal Arbitration Act of the claims asserted against it by former cable subscriber Brandon Hodges, and remanded with instructions to grant the motion.

Hodges brought a putative class action challenging certain of Comcast's privacy and data-collection practices and seeking a variety of monetary and equitable remedies. Comcast moved to compel arbitration pursuant to Hodges' subscriber agreements. The district court held that, because Hodges' complaint sought "public injunctive relief" as one of its requested remedies, the complaint implicated California's *McGill* rule, under which an arbitration provision that waives the right to seek "public injunctive relief" in all forums is unenforceable.

The panel held that the applicability of the *McGill* rule depends upon whether a complaint includes a claim for public injunctive relief. Taking into account *Blair v. Rent-*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019) (holding that the Federal Arbitration Act does not preempt the *McGill* rule), the panel held that, under California law, non-waivable public injunctive relief is limited to forward-looking injunctions that seek to prevent future violations of law for the benefit of the general public as a whole, as opposed to a particular class of persons, and that do so without the need to consider the individual claims of any non-party. Declining to rely on *Mejia* and *Maldonado*, recent California Court of Appeal decisions broadening the *McGill* rule, the panel concluded that these decisions rested on such a patent misreading of California law that they would not be followed by the California Supreme Court.

The panel concluded that under the above standard, Hodges' complaint did not seek public injunctive relief. Accordingly, the *McGill* rule was not implicated, and the arbitration agreement should have been enforced.

Dissenting, Judge Berzon wrote that she disagreed with the majority's conclusion, contrary to the court's precedent and to recent decisions of the California Court of Appeal, that a forward-looking injunction protecting the privacy rights of millions of cable consumers was not "public injunctive relief" under California state law.

## COUNSEL

Mark A. Perry (argued) and Joshua M. Wesneski, Gibson Dunn & Crutcher LLP, Washington, D.C.; Michael W. McTigue Jr., Meredith C. Slawe, and Seamus C. Duffy, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, Pennsylvania; Michael J. Stortz, Akin Gump Strauss Hauer & Feld LLP, San Francisco, California; for Defendant-Appellant.

Karla Gilbride (argued), Public Justice P.C., Washington, D.C.; Ray Gallo, Gallo LLP, San Francisco, California; Hank Bates and David Slade, Carney, Bates & Pulliam PLLC, Little Rock, Arkansas; for Plaintiff-Appellee.

Gary B. Friedman, Los Angeles, California; Professor Myriam E. Gilles, Benjamin N. Cardozo School of Law, New York, New York; for Amici Curiae Civil Procedure and Arbitration Law Professors.

Roger N. Heller and Ian R. Bensberg, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California, for Amici Curiae Consumer Organizations.

## ORDER

The dissenting opinion of Judge Berzon, previously published at 12 F.4th 1108, 1122–26, is replaced by the accompanying amended dissent. The majority opinion previously published at 12 F.4th 1108 remains unchanged.

Judges Collins and VanDyke have voted to deny the petition for panel rehearing and the petition for rehearing en banc (Dkt. No. 58). Judge Berzon has voted to grant the petition for panel rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. See FED. R. APP. P. 35. The petition for panel rehearing and the petition for rehearing en banc, filed October 22, 2021, are **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

COLLINS, Circuit Judge:

Comcast Cable Communications, LLC ("Comcast") appeals the district court's denial of its motion to compel arbitration of the claims asserted against it by former cable subscriber Brandon Hodges. Hodges brought this putative class action challenging certain of Comcast's privacy and data-collection practices and seeking a variety of monetary and equitable remedies. The district court held that, because Hodges' complaint sought "public injunctive relief" as one of its requested remedies, the complaint implicated the so-called "*McGill* rule," under which a contractual provision that waives the right to seek "public injunctive relief" in all

forums is unenforceable.  *McGill v. Citibank, N.A.*, 393 P.3d 85, 87 (Cal. 2007).  The parties did not dispute that, if the relief Hodges seeks is classified as public injunctive relief, the non-severable arbitration provisions of Hodges' subscriber agreements with Comcast did seek to waive that public injunctive relief in any forum.  Accordingly, the district court held that those provisions were unenforceable under *McGill*.  We conclude that the district court misconstrued what counts as "public injunctive relief" for purposes of the *McGill* rule and that it therefore erred in concluding that the complaint here sought such relief.  Because Hodges' complaint did not seek such relief, the *McGill* rule is not implicated, and the arbitration agreement should have been enforced.  We therefore reverse the district court's denial of Comcast's motion to compel.

## I

Between October 2015 and January 2018, Hodges subscribed to Comcast's cable television services at his home in Oakland, California.  In February 2018, Hodges filed a complaint in California state court on behalf of a putative class of California residential Comcast subscribers, alleging that Comcast violated class members' statutory privacy rights in collecting "data about subscribers' cable television viewing activity" as well as "personally identifiable demographic data about its subscribers." Specifically, Hodges alleged that Comcast violated the Cable Communications Policy Act of 1984 ("Cable Act"), by (1) failing to clearly inform subscribers of how long Comcast would keep such information; (2) failing to provide subscribers with access to this information upon request; and (3) failing to obtain subscribers' consent before gathering information about viewing activity.  *See* 47 U.S.C. § 551(a)(1)(C), (b), (d).  Hodges also alleged that Comcast

violated the California Invasion of Privacy Act ("CIPA"), by
(1) failing to obtain subscribers' consent before using its
cable boxes to collect viewing activity; and (2) failing to
disclose, within 30 days of a subscriber request,
"individually identifiable subscriber information" Comcast
had collected.   CAL. PEN. CODE § 637.5(a)(1), (d).   In
addition, Hodges asserted that the same five violations of the
Cable Act and CIPA constituted "unlawful" business
practices, thereby giving rise to a derivative cause of action
under California's unfair competition law ("UCL"), CAL.
BUS. & PROF. CODE § 17200 *et seq*.   On behalf of himself
and the putative class, Hodges sought liquated, statutory, and
punitive damages; seven specified forms of "statewide
public injunctive relief"; and attorney's fees.

Comcast removed the case to the U.S. District Court for
the Northern District of California based on federal question
jurisdiction, *see* 28 U.S.C. § 1331, and diversity jurisdiction
under the Class Action Fairness Act, *id*. § 1332(d).   Noting
that each version of Hodges' various "Subscriber
Agreements" with Comcast contained an arbitration
provision, Comcast then moved to compel arbitration.
Hodges opposed the motion, arguing that the arbitration
provision was unenforceable under *McGill* because its non-
severable "Waiver of Class Actions and Collective Relief"
impermissibly deprived Hodges of the right to pursue public
injunctive relief in any forum.[1]   In reply, Comcast argued

---

[1] For example, the final agreement Hodges received in January
2018, when he terminated his cable service but continued internet service
with Comcast, included the following language (which is reproduced
here without its use of all capitalization):

**Waiver of Class Actions and Collective Relief.**
There shall be no right or authority for any claims to

that *McGill* was inapplicable because Hodges was not seeking public injunctive relief and that, in any event, the *McGill* rule is preempted by the Federal Arbitration Act ("FAA").

Because the question of whether *McGill* was preempted by the FAA had already been raised in several cases before this court, the district court stayed the case pending our resolution of that issue. After we held in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 822 (9th Cir. 2019), that the FAA did not preempt the *McGill* rule, the district court denied Comcast's motion to compel arbitration. Comcast filed an interlocutory appeal challenging the district court's ruling, and we have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(B).

---

be arbitrated or litigated on a class action, joint or consolidated basis or on bases involving claims brought in a purported representative capacity on behalf of the general public (such as a private attorney general), other subscribers, or other persons. The arbitrator may award relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that individual party's claim. The arbitrator may not award relief for or against anyone who is not a party. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. This waiver of class actions and collective relief is an essential part of this arbitration provision and cannot be severed from it.

## II

Section 2 of the FAA provides that

> [a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court has "described this provision as reflecting both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).  "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms."  *Id.* (simplified).  The final clause of § 2—the "saving clause"—confirms that arbitration agreements, like any other contract, can be invalidated on generally applicable grounds "for the revocation of any contract."  9 U.S.C. § 2.  But arbitration agreements may not be invalidated "by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  *Concepcion*, 563 U.S. at 339.

This case involves one such ground for contractual invalidation under California law, *viz.*, the so-called "*McGill* rule."  Under that rule, insofar as a contractual provision "purports to waive [a party's] right to request in any forum . . . public injunctive relief, it is invalid and unenforceable under California law."  *McGill*, 393 P.3d at 94.  We held in *Blair* that "the FAA does not preempt the *McGill* rule," 928 F.3d at 830–31, and we therefore reject Comcast's contrary arguments here.  The only remaining question

before us, then, is whether Comcast's enforcement of the Subscriber Agreement in this case violates the *McGill* rule. We conclude that, because Hodges' complaint does not seek public injunctive relief, the *McGill* rule is not implicated and that rule therefore does not bar enforcement of the arbitration provision.

**A**

As an initial matter, Hodges argues that, in addressing whether the *McGill* rule is implicated in this case, it is irrelevant whether his complaint "actually includes a claim" for public injunctive relief. All that matters, in his view, is whether the Subscriber Agreement's language theoretically purports to waive public injunctive relief in *any* case. This argument is foreclosed by *McGill* itself. In addressing whether the contract in that case was unenforceable, the California Supreme Court stated that, in "answering this question, we *first* conclude that McGill's complaint does, in fact, appear to seek . . . public injunctive relief." 393 P.3d at 90 (emphasis added). And in *Mejia v. DACM Inc.*, 268 Cal. Rptr. 3d 642 (Cal. Ct. App. 2020), the California Court of Appeal likewise began its analysis of the applicability of the *McGill* rule by addressing whether the operative complaint actually sought public injunctive relief in the first place. *See id.* at 650–53 (holding that the complaint *did* seek such relief and that *McGill* invalidated the arbitration provision).

The same conclusion follows from our decision in *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052 (9th Cir. 2013) (en banc). In *Kilgore*, we held that it was unnecessary to reach the particular FAA preemption question presented there precisely *because* the plaintiffs' requested injunctions in that case did not qualify as public injunctive relief. 718 F.3d at 1060–61. *Kilgore* involved the distinct "*Broughton-Cruz*

rule," *id*. at 1060, under which "[a]greements to arbitrate claims for public injunctive relief" under certain California consumer statutes "are not enforceable in California," *McGill*, 393 P.3d at 90.[2]  Under Hodges' flawed view of California law, the mere *presence* of a requirement to arbitrate public injunctive relief in a contract should have been enough to invalidate the arbitration provision in *Kilgore* under the *Broughton-Cruz* rule—meaning that the ability to compel arbitration in *Kilgore* could *not* depend upon whether public injunctive relief was actually being requested in that case.  But we held exactly the opposite, concluding that the particular injunctions being sought by the plaintiffs in *Kilgore* did not involve public injunctive relief; that the *Broughton-Cruz* rule therefore was not implicated; that we therefore did not need to decide whether that rule was preempted by the FAA; and that arbitration was required.  *Kilgore*, 718 F.3d at 1060–61.[3]  The California Court of Appeal followed the same approach in another case addressing the applicability of the *Broughton-Cruz* rule.  *See Clifford v. Quest Software Inc.*, 251 Cal. Rptr. 3d 269, 276–78 (Cal. Ct. App. 2019) (concluding that the relevant cause of action did not seek public injunctive relief and that arbitration therefore could be compelled without addressing whether the *Broughton-Cruz* rule was preempted).

---

[2] The rule's name derives from the pair of cases that established it, namely, *Broughton v. Cigna Healthplans of California*, 988 P.2d 67, 76 (Cal. 1999), and *Cruz v. PacifiCare Health Systems, Inc.*, 66 P.3d 1157, 1164–65 (Cal. 2003).

[3] We later held that, given the fact that the *Broughton-Cruz* rule applied *only* to *arbitration* agreements, it was not a generally applicable ground for invalidating a contract and was therefore preempted by the FAA.  *See Blair*, 928 F.3d at 827; *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 934 (9th Cir. 2013).

The applicable precedent thus forecloses Hodges'
argument that courts should stretch to invalidate contracts
based on hypothetical issues that are not actually presented
in the parties' dispute.   We therefore turn to whether
Hodges' complaint requests public injunctive relief within
the meaning of the *McGill* rule.

**B**

We begin by setting forth the standards for what
constitutes non-waivable public injunctive relief under
California law.  In addressing that question, we "'are bound
by decisions of the state's highest court,'" *Alliance for Prop.
Rights & Fiscal Responsibility v. City of Idaho Falls*,
742 F.3d 1100, 1103 (9th Cir. 2013) (citation omitted), and
in deciding any unresolved or unclear questions of state law,
we are guided by the principles that the state high court has
articulated, *id.*   In construing the substantive scope of
*McGill*'s contract-invalidation rule, we also cannot lose sight
of the critical limitations on that rule that saved it from
preemption as a matter of federal law in *Blair*.  We review
all questions of law de novo.  *United States v. Robertson*,
980 F.3d 672, 675 (9th Cir. 2020).

**1**

*McGill* derived its rule against waiver of public
injunctive relief from California Civil Code § 3513, which
provides: "Any one may waive the advantage of a law
intended solely for his benefit.  But a law established for a
public reason cannot be contravened by a private
agreement."  *See* 393 P.3d at 93–94.  Because the primary
consumer protection laws at issue in *McGill*—*i.e.*, the UCL;
the Consumers Legal Remedies Act ("CLRA"), CAL. CIV.
CODE § 1750 *et seq.*; and California's false advertising law,
CAL. BUS. & PROF. CODE § 17500 *et seq.*—all authorize

injunctive relief that is primarily "for the benefit of the general public," *Broughton*, 988 P.2d at 78 (making this point as to the CLRA); *see also Cruz*, 66 P.3d at 1164–65 (same as to the UCL and the false advertising law), the *McGill* court held that any waiver of the "right to request in any forum such public injunctive relief . . . is invalid and unenforceable under California law."  393 P.3d at 94.

Consistent with California Civil Code § 3513's distinction between relief for the benefit of private individuals and relief for the benefit of the general public as a whole, *McGill* explained that California law

> distinguished between private injunctive relief—*i.e.*, relief that primarily resolves a private dispute between the parties and rectifies individual wrongs and that benefits the public, if at all, only incidentally—and public injunctive relief—*i.e.*, relief that by and large benefits the general public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public.

393 P.3d at 89 (simplified).  In further describing the sort of "public injunctive relief" that is not subject to waiver under California law, the California Supreme Court in *McGill* emphasized three key features.

First, the Court stated that public injunctive relief "has 'the primary purpose and effect of *prohibiting* unlawful acts that threaten *future* injury to the general public."  *McGill*, 393 P.3d at 90 (emphasis added) (citation omitted).  Thus, in contrast to relief aimed at "redressing or preventing injury" to a person or group of persons, *id.*, forward-looking relief that generally aims to prevent unlawful conduct in the future

is more likely to be characterized as reflecting statutory rights that are "established for a public reason." CAL. CIV. CODE § 3513.

Second, the *McGill* court emphasized that a request for public injunctive relief "does *not* constitute the pursuit of representative claims or relief on behalf of others," nor does it involve "prosecut[ing] actions on behalf of the general public." 393 P.3d at 92–93 (simplified) (emphasis added). The court made this observation in the course of explaining why Proposition 64's amendments to the UCL did not eliminate the ability of a private plaintiff to seek public injunctive relief under that statute. Proposition 64 stated that UCL actions on behalf of the general public could be brought by "only the California Attorney General and local public officials," Prop. 64, § 1(f), and it further prohibited any private representative actions other than class actions, *see* CAL. BUS. & PROF. CODE § 17203. The *McGill* court held that these limitations did not affect the ability of a private UCL plaintiff to request public injunctive relief, because such relief did not require any such representative action, either on behalf of a class or the general public. Rather, as the court explained, the requirement that an "'action be brought as a class action'" has "never been imposed with regard to requests to enjoin future wrongful business practices that will injure the public." 393 P.3d at 93 (citation omitted).

Third, the court relatedly drew a sharp distinction with respect to ascertainability between the beneficiaries of private and public injunctive relief. The court explained that, in contrast to private injunctive relief, which provides benefits "to an individual plaintiff—or to a *group of individuals similarly situated* to the plaintiff," public injunctive relief involves diffuse benefits to the "general

public" as a whole, and the general public "'fails to meet'" the class-action requirement of "'an ascertainable class.'" 393 P.3d at 90, 93 (emphasis added) (citations omitted).

It follows that public injunctive relief within the meaning of *McGill* is limited to forward-looking injunctions that seek to prevent future violations of law for the benefit of the general public as a whole, as opposed to a particular class of persons, and that do so without the need to consider the individual claims of any non-party. The paradigmatic example would be the sort of injunctive relief sought in *McGill* itself, where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan. 393 P.3d at 90–91. Such an injunction attempts to stop future violations of law that are aimed at the general public, and imposing or administering such an injunction does not require effectively fashioning individualized relief for non-parties. *See also Cruz*, 66 P.3d at 1159–60 (plaintiff sought injunctive relief against PacifiCare's false advertising in "misrepresenting or failing to disclose internal policies that lower the quality of services provided"); *Broughton*, 988 P.2d at 71 (plaintiff sought "an order enjoining [defendant Cigna's] deceptive methods, acts, and practices," which allegedly included "deceptively and misleadingly advertis[ing] the quality of medical services which would be provided under its health care plan").

By contrast, when the injunctive relief being sought is for the benefit of a discrete class of persons, or would require consideration of the private rights and obligations of individual non-parties, it has been held to be private injunctive relief. For example, in *Kilgore*, the plaintiffs alleged that the loans and contracts they had executed to attend a since-failed helicopter-pilot school did not contain certain disclosures required by Federal Trade Commission

regulations. 718 F.3d at 1056 & n.3. As a remedy, the plaintiffs sought an injunction under the UCL to prevent the defendant bank from reporting their student loan defaults to credit agencies and from enforcing the student loan notes. *Id.* Sitting en banc, we held that the plaintiffs were not seeking public injunctive relief because the requested injunction against enforcing these loans or reporting associated loan defaults on credit reports "plainly would benefit only the approximately 120 putative class members" and not the general public. *Id.* at 1060–61. We further noted that, in contrast to seeking forward-looking relief against future unlawful acts aimed at the general public, the requested injunction, "for all practical purposes, relates only to *past* harms suffered by the members of the limited putative class." *Id.* at 1061 (emphasis added).

Likewise, in *Clifford*, the California Court of Appeal held that even prospective injunctive relief was not "public" when the primary beneficiaries were a defined group of similarly situated persons, rather than the general public. There, the plaintiff alleged a variety of wage and hour claims arising from his employer's alleged misclassification of him as an "exempt employee." 251 Cal. Rptr. 3d at 273. Although the plaintiff sought an injunction to prevent his employer from committing further similar violations of law in the future, the court held that this did *not* constitute a request for public injunctive relief. The only "potential beneficiaries" of the requested forward-looking relief were "Quest's *current* employees, not the public at large." *Id.* at 277 (emphasis added). In reaching this conclusion, the court emphasized *McGill*'s statement that, in order to qualify as public injunctive relief, the requested injunction must go beyond "'redressing or preventing injury to an individual plaintiff—*or to a group of individuals similarly situated to the plaintiff.*'" *Id.* at 278 (quoting *McGill*, 393 P.3d at 90)

(emphasis added by *Clifford*); *see also Torrecillas v. Fitness Int'l, LLC*, 266 Cal. Rptr. 3d 181, 191 (Cal. Ct. App. 2020) (requested relief was not public injunctive relief because the "beneficiary of an injunction would be Torrecillas and possibly Fitness's current employees, not the public at large").

We emphasized these same key features of public injunctive relief when we held in *Blair* that the *McGill* rule was not preempted by the FAA. Thus, in holding that public injunctive relief did not entail a level of procedural formality or complexity that would be inconsistent with arbitration's goal of streamlined proceedings, we expressly relied on *McGill*'s holdings that (1) a "plaintiff requesting a public injunction files the lawsuit 'on his or her own behalf,'" and not in any sort of representative capacity; (2) as a result, "claims for public injunctive relief need not comply with state-law class procedures"; and (3) the beneficiaries of public injunctive relief are "the general public" as a whole and not "specific absent parties." *Blair*, 928 F.3d at 828–29. In light of these crucial features of the *McGill* rule, we held that a request for public injunctive relief "does not interfere with the bilateral nature of a typical consumer arbitration." *Id*. at 829; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) ("In bilateral arbitration, parties forego the procedural rigor . . . in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."). Moreover, in explaining why the relief sought in *Blair* included public injunctive relief, we noted that it sought to stop Rent-A-Center from using an unlawful pricing structure, 928 F.3d at 822–23, thereby enjoining "future violations" of

California law in a manner that diffusely benefitted the general public as a whole, *id*. at 831 n.3.[4]

Given the loadbearing weight we placed on these aspects of *McGill* in *Blair*, we think it is clear that any broader conception of public injunctive relief, beyond what we have set forth above, would have required a different conclusion as to the preemption issue. If California's *McGill* rule had sought to preserve, as non-waivable, the right to formally represent the claims of others, to seek retrospective relief for a particular class of persons, or to request relief that requires consideration of the individualized claims of non-parties, then such a rule would plainly "interfere with the informal, bilateral nature of traditional consumer arbitration." *Blair*, 928 F.3d at 830; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018) (state-law rule that a contract is unenforceable "just because it requires bilateral arbitration" is preempted because it "impermissibly disfavors arbitration" (emphasis omitted)).

### 2

In arguing for a broader reading of *McGill*, Hodges relies on the recent decision of Division Three of the Fourth

---

[4] Notably, in reaching that conclusion in *Blair*, we did not rely on the *other* forms of injunctive relief that the plaintiff requested in that case, namely, an order requiring Rent-A-Center to perform a retroactive "accounting of monies obtained from California consumers" and to provide "individualized notice to those consumers of their statutory rights." 928 F.3d at 823. In contrast to the public injunctive relief described in *McGill*, these other forms of requested relief in *Blair* were retrospective, aimed at a specific class of persons (*i.e.*, those who already had Rent-A-Center contracts), or would require individualized consideration of the private rights and obligations of particular non-parties.

District Court of Appeal in *Mejia*, 268 Cal. Rptr. 3d 642, in which the court substantially broadened the *McGill* rule by effectively defining as "public injunctive relief" *any* forward-looking injunction that restrains *any* unlawful conduct.   Hodges also notes that *Mejia*'s analysis was reaffirmed in another recent decision issued by the same division of the same district in *Maldonado v. Fast Auto Loans, Inc.*, 275 Cal. Rptr. 3d 82 (Cal. Ct. App. 2021).  For two reasons, Hodges' reliance on these cases is unavailing.

**a**

First, *Mejia*'s expanded version of the *McGill* rule rests on such a patent misreading of California law that we do not think it would be followed by the California Supreme Court. *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007) (panel is not required to follow intermediate state appellate authority where there is convincing evidence that the state supreme court would decide differently).

In particular, *Mejia* improperly disregards the key features of public injunctive relief set forth by the state high court in *McGill*.  The alleged violation in *Mejia* involved the defendant motorcycle seller's failure to provide purchasers "with a *single document* setting forth all the financing terms" for the sale, *see Mejia*, 268 Cal. Rptr. 3d at 644, and the plaintiff requested an injunction against any *sale* that did not provide the requisite information in a single document, *id.* at 645.  By its terms, this relief would primarily benefit the class of persons who actually purchased motorcycles, and not the general public as a whole.  *See McGill*, 393 P.3d at 90 (relief whose "primary purpose or effect" is "preventing injury . . . to a group of individuals similarly situated to the plaintiff . . . does not constitute public injunctive relief").  Moreover, implementing such a decree could require the examination of the paperwork of each individual sale to

determine whether the particular financing terms and other requisite disclosures for that given sale were all included in a single document. *See id*. at 93 (public injunctive relief "does not constitute the pursuit of representative claims or relief on behalf of others" (simplified)).   As we have explained, these are precisely the sorts of features that have led to a finding of *private* injunctive relief. *See supra* at 15–16.

The *Mejia* court nonetheless held that the relief requested was public.  268 Cal. Rptr. 3d at 651.  It did so in a brief discussion that (1) declared, without analysis, that the complaint's requested injunctive relief concerning the sales documents of future motorcycle purchasers "encompasse[d] 'consumers' generally" and (2) then announced that such relief was therefore "'injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.'"   *Id*. (quoting *McGill*, 393 P.3d at 87).  This truncated analysis effectively shears off the limiting elements that were recited in *McGill* and that we found critical to avoiding preemption in *Blair*.  It instead rests on the implicit premise that *any* forward-looking relief to enjoin *any* illegal conduct is automatically public injunctive relief that benefits the general public as a whole. *Id*.  This is a clear misreading of *McGill*, *Broughton*, and *Cruz*. *See supra* at 12–15.

To the extent that *Maldonado* follows and applies *Mejia*'s flawed analysis, it is equally mistaken.   The plaintiffs in *Maldonado* sought injunctive relief, *inter alia*, that would prevent the defendant lender from charging unconscionably excessive interest rates on loans and that would require the lender to undertake "corrective advertising" and to maintain the requisite California lender licenses.  275 Cal. Rptr. 3d at 85–86.  To be sure, some of

the relief requested in *Maldonado*—such as an injunction to maintain the appropriate lender licenses and to undertake a corrective advertising campaign—would appear to meet *McGill*'s more circumscribed articulation of what counts as non-waivable public injunctive relief. But *Maldonado* went further and, relying on *Mejia*, held that an injunction aimed at preventing "unconscionable" loan agreements with excessive interest rates was public injunctive relief. *Id.* at 90. For multiple reasons, that conclusion was plainly incorrect.

*Maldonado*'s conclusion that an injunction against unconscionable loan agreements "encompasses all consumers and members of the public," rather than just a discrete class of persons who are similarly situated to the plaintiffs, 275 Cal. Rptr. 3d at 90, is clearly wrong. By its terms, *that* requested relief only benefits those who actually sign lending agreements, and not the public more generally. The court was likewise incorrect in suggesting that such an injunction would not benefit the plaintiffs themselves "because they have already been harmed and are already aware of the misconduct." *Id.* That might be true as to the *other* forms of relief requested (such as corrective advertising), but the plaintiffs and the class members would plainly benefit from an injunction barring unconscionable loan agreements, thereby underscoring that *that* relief is private injunctive relief. The court was also wrong in suggesting that, simply because an injunction against unconscionable loan agreements with excessive interest rates would also extend to *future* borrowers, the relief was necessarily non-waivable public injunctive relief. *Id.* at 91. As *McGill* makes clear, an incidental public benefit from what is otherwise class-wide private injunctive relief is not sufficient to establish that the requested injunction is actually public relief. 393 P.3d at 89. Furthermore, determining

whether any particular future loan agreement was unconscionable due to its interest rate would require an individualized inquiry that considers whether, "under the circumstances of the case, taking into account the bargaining process and prevailing market conditions—a particular rate was 'overly harsh,' 'unduly oppressive,' or 'so one-sided as to shock the conscience.'" *De La Torre v. CashCall, Inc.*, 422 P.3d 1004, 1015 (Cal. 2018) (citations omitted). For all of these reasons, *Maldonado* plainly erred in holding that any injunction aimed at prohibiting the defendant "'from *continuing to engage* in its allegedly illegal and deceptive practices'" is public injunctive relief. 275 Cal. Rptr. 3d at 91 (citation omitted).

The dissent's effort to defend *Mejia* and *Maldonado* is both unpersuasive and inconsistent with other precedent. While conceding that the requested injunctive relief in both cases would primarily benefit only those who entered into contracts with the defendants, the dissent argues that there is nonetheless a benefit to the general public in the sense that persons *considering* entering into such contracts would also be protected. *See* Dissent at 32–33. But as *McGill* explained, whether a requested injunction is public or private depends upon who are the *primary* beneficiaries, and the existence of an incidental benefit to the general public is not enough to classify that relief as non-waivable public injunctive relief. 393 P.3d at 89. Moreover, as the dissent acknowledges, other courts—including this court—have already recognized that injunctive relief aimed at regulating the substantive terms of contractual arrangements is private injunctive relief that primarily benefits those who enter into such contracts. *See Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 2021 WL 3282092, at *13 (9th Cir. 2021) (relief regulating Uber drivers' relationship with Uber is primarily directed at those who become Uber drivers and "only

'benefit[s] the general public incidentally'" (quoting *Blair*, 928 F.3d at 824)); *Clifford*, 251 Cal. Rptr. 3d at 277 (requested injunctive relief concerning wages and hours would primarily benefit defendant Quest Software's "current employees" rather than "the public at large"). The dissent seeks to distinguish these cases on the ground that it is more cumbersome to become an employee of Quest Software or an Uber driver, *see* Dissent at 36, but that distinction has nothing at all to do with what *McGill* says is the relevant inquiry, namely, who are the *primary* beneficiaries of the requested injunctive relief.

The dissent is also wrong in contending that our rejection of *Mejia* and *Maldonado* is actually based on the "implicit premise" that the only type of injunction that counts as public injunctive relief is one directed against false advertising. *See* Dissent at 34. That strawman argument is belied by the substantive analysis set forth earlier, which merely describes such an injunction as *illustrative* of public injunctive relief, just as *McGill* itself did. *See* 393 P.3d at 89–90 (noting that *Broughton* and *Cruz*, which involved injunctions against false advertising, were paradigmatic examples of public injunctive relief). And it is further belied by our acknowledgment that, for example, the request for an injunction that the defendant in *Maldonado* obtain and maintain the required lender licenses qualifies as public injunctive relief. *See supra* at 20–21.

**b**

Second, even if we are wrong in concluding that the California Supreme Court would not follow *Mejia*'s and *Maldonado*'s broader reading of the *McGill* rule, Hodges' argument would still fail for the independent and alternative reason that their expansion of the *McGill* rule is preempted by the FAA.

As we have explained, the broader *Mejia-Maldonado* rule—namely, that *any* injunction against future illegal conduct constitutes non-waivable public injunctive relief—ignores the key features of the *McGill* rule that saved it from preemption under the FAA in *Blair*. In upholding the *McGill* rule, we emphasized that the category of public injunctive relief described in *McGill* did not involve the sort of procedural complexity or formality that would be inconsistent with the FAA's objective of "'facilitat[ing] streamlined proceedings'" in arbitration. 928 F.3d at 828 (quoting *Concepcion*, 563 U.S. at 344). We reached that conclusion because, as described in *McGill*, public injunctive relief does not entail acting in a representative capacity, does not require class-action procedures, and does not primarily benefit "specific absent parties." *Id*. at 928–29; *see supra* at 17.

The same cannot be said of the broader version of the *McGill* rule embraced in *Mejia* and *Maldonado*. Because it disregards all of the limitations on public injunctive relief that were emphasized in *McGill* and *Blair*, the broader *Mejia-Maldonado* rule forbids waiving claims for prospective injunctive relief against unlawful conduct even if, for example, the implementation of such an injunction would require evaluation of the individual claims of numerous non-parties. The point is illustrated by considering the particular types of injunctive relief sought in *Mejia* and *Maldonado* themselves—namely, injunctions regulating the drafting and substantive terms of actual contracts with innumerable different persons. *See supra* at 19–23. Implementing such relief would require a level of procedural complexity that is inherently incompatible "with the informal, bilateral nature of traditional consumer arbitration," *Blair*, 928 F.3d at 830, and with the "efficient, streamlined procedures" that the FAA seeks to protect.

*Concepcion*, 563 U.S. at 344; *cf. Broughton*, 988 P.2d at 77 (noting that, "[i]n some cases, the continuing supervision of an injunction is a matter of considerable complexity" that involves "quasi-executive functions of public administration that expand far beyond the resolution of private disputes").[5]

The dissent wrongly discounts the fact that the *Mejia-Maldonado* rule precludes waiver of forward-looking injunctive relief, even if its implementation would involve administrative complexity that is inconsistent with bilateral arbitration. According to the dissent, this concern is irrelevant, because an adjudicator would not need to "examine the claims" of individuals "*before* entering an order like that." *See* Dissent at 38 (emphasis added). But injunctions are not simply words on a page, and their compatibility with bilateral arbitration must be evaluated in light of how they would actually be *implemented*, as the California Supreme Court itself recognized in *Broughton*. 988 P.2d at 77.

By insisting that contracting parties may not waive a form of relief that is fundamentally incompatible with the sort of simplified procedures the FAA protects, the *Mejia-Maldonado* rule effectively bans parties from agreeing to arbitrate all of their disputes arising from such contracts. To

---

[5] It is worth recalling that, when *Broughton* and *Cruz* initially set out to define a category of public injunctive relief, they did so in the course of formulating a rule that sought to identify forms of relief that were so *fundamentally inconsistent* with arbitration that California law did not permit "this type of injunctive relief to be arbitrated." *Broughton*, 988 P.2d at 76. Such an explicitly anti-arbitration rule is, of course, preempted by the FAA, *see Ferguson*, 733 F.3d at 934, and in *McGill*, the California Supreme Court expressly pivoted away from the "*Broughton-Cruz* rule" and instead sought to define the specific class of public injunctive relief that could never be waived. 393 P.3d at 90.

say that such a rule is not preempted would flout Supreme Court authority. *See, e.g.*, *Epic Sys.*, 138 S. Ct. at 1623 (holding that, under *Concepcion*, "courts may not allow a contract defense to reshape traditional individualized arbitration" and "a rule seeking to declare individualized arbitration proceedings off limits" is preempted by the FAA). And that we cannot do.

## C

Accordingly, we reaffirm that non-waivable "public injunctive relief" within the meaning of the *McGill* rule refers to prospective injunctive relief that aims to restrain future violations of law for the benefit of the general public as a whole, rather than a discrete subset of similarly situated persons, and that does so without requiring consideration of the individual claims of non-parties. *See supra* at 15–16. With these principles in mind, we address whether Hodges' complaint seeks such relief. Although the complaint labels the requested relief as "public," we must look beyond such conclusory assertions and assess for ourselves whether, under the applicable standards, the relief requested implicates the *McGill* rule. We conclude that it does not.

The complaint seeks injunctive relief requiring Comcast to take the following actions with respect to those persons who are "cable subscribers" of Comcast (all emphasis added):

> (1) "clearly and conspicuously notify *cable subscribers* in writing, at the requisite times, of the period during which it maintains their [personally identifiable information ("PII")], including video activity data and demographic data";

(2) "stop using its cable system to collect *cable subscribers'* personally identifiable video activity data for advertising purposes without their prior written or electronic consent";

(3) "destroy all personally identifiable video activity data collected from *cable subscribers* for advertising purposes without prior written or electronic consent and any information derived in whole or part from such data";

(4) "change its procedures to provide *cable subscribers* who request access to their PII with access to all such PII in Comcast's possession, including video activity data and demographic data";

(5) "stop using its cable system to record, transmit, or observe video activity data about *cable subscribers* without their express written consent";

(6) "destroy all video activity data collected from *cable subscribers* through Comcast's cable system without their express written consent";

(7) "provide *cable subscribers* who request access to their individually identifiable subscriber information with access to all such information gathered by Comcast within 30 days, including video activity data."

At least *some* (but not all) of these requested forms of relief seek forward-looking prohibitions against future violations of law.  But as we have explained, that alone is not enough to classify the remedy as public injunctive relief within the meaning of the *McGill* rule.  And unlike the public injunctive relief sought in *McGill*, *Broughton*, and *Cruz*, these requests on their face stand to benefit only Comcast "cable subscribers"—*i.e.*, by definition they will only benefit a "group of individuals similarly situated to the plaintiff." *McGill*, 393 P.3d at 90; *see also Capriole*, 7 F.4th at 854, 2021 WL 3282092, at *13; *Clifford*, 251 Cal. Rptr. 3d at 278. There is simply no sense in which this relief could be said to *primarily* benefit the general public as a more diffuse whole. *See McGill* 393 P.3d at 89–90 (relief that incidentally benefits the public does not suffice to convert private relief to public relief).

Moreover, it is apparent that administering any injunctive relief of the sort sought here would entail the consideration of the individualized claims of numerous cable subscribers.  The relief sought here is not the equivalent of a simple prohibition on running a false advertisement or a mandatory injunction to obtain certain licenses or to make additional public disclosures in advertising.  On the contrary, each form of relief would require either consideration of which particular consents each subscriber has or has not given or examination of which individualized disclosures have or have not been made.  Administering an injunction of this sort, on this scale, is patently incompatible with the procedural simplicity envisioned by bilateral arbitration. *Stolt-Nielsen*, 559 U.S. at 685–86; *Concepcion*, 563 U.S. at 348–49.  We do not construe California's *McGill* rule as purporting to insist that the right to seek *that* sort of relief is non-waivable. But to the extent that the *McGill* rule did so, it would be a much different rule from the one we confronted

in *Blair*, and this broader version of the rule is preempted by the FAA.

### III

We reverse the district court's denial of Comcast's motion to compel arbitration, and we remand to the district court with instructions to grant that motion.

**REVERSED AND REMANDED.**

BERZON, Circuit Judge, dissenting:

The majority concludes, contrary to our precedent and to recent decisions of the California Court of Appeal, that a forward-looking injunction protecting the privacy rights of millions of cable consumers is not "public injunctive relief" under California state law. I disagree.

This case is indistinguishable from our decision in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019), and the California Court of Appeal's recent decisions in *Mejia v. DACM Inc.*, 54 Cal. App. 5th 691 (2020), and *Maldonado v. Fast Auto Loans, Inc.*, 60 Cal. App. 5th 710 (2021), all of which held that an injunction affecting the contract terms a business could offer to members of the public qualified as public injunctive relief. Here, too, Hodges requests an injunction that would require Comcast to provide a statutorily mandated notice at the time an agreement is entered—that is, when a member of the general public is deciding whether to become a Comcast subscriber. Just as in *Blair*, *Mejia*, and *Maldonado*, the relief sought here "has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public" and is therefore

public injunctive relief. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 951 (2017).

In *Blair*, the plaintiffs "entered into rent-to-own agreements" with Rent-A-Center, which "operates stores that rent household items to consumers for set installment payments." *Blair*, 928 F.3d at 822. The plaintiffs "alleged that Rent-A-Center structured its rent-to-own pricing in violation of [California] law." *Id.* In particular, the plaintiffs alleged violations of a statute that sets maximum prices that businesses may charge for rent-to-own items, in proportion to the items' actual cost. *Id.* at 823. Plaintiffs sought "to enjoin future violations of these laws." *Id.*

Obviously, the injunction requested in *Blair* would not directly benefit *every* member of the general public. It would benefit those members of the public who contemplate entering into rent-to-own agreements with Rent-A-Center or do enter into such agreements, by ensuring that they are offered terms compliant with California law. We concluded in *Blair* that the plaintiffs sought public injunctive relief. *Id.* at 831 n.3. We reasoned that "Blair seeks to enjoin future violations of California's consumer protection statutes, relief oriented to and for the benefit of the general public." *Id.*

Similarly, in *Mejia*, the plaintiff bought a used motorcycle from a dealership, Del Amo, and financed the purchase using a credit card he obtained through the dealership. *Mejia*, 54 Cal. App. 5th at 694. He alleged that the dealership had violated a state law requiring it "to provide its customers with a *single document* setting forth all the financing terms for motor vehicle purchases made with a conditional sale contract." *Id.* at 695. The plaintiff sought "an injunction prohibiting Del Amo from selling motor vehicles 'without first providing the consumer with a single document containing all of the agreements of Del Amo and

the consumer with respect to the total cost and the terms of payment for the motor vehicle.'" *Id.* at 695–96.

Del Amo maintained that the injunction requested was "private" because it would "benefit only a 'narrow group of Del Amo customers'—the class of similarly situated individuals who, like Mejia, would buy a motorcycle from Del Amo with a conditional sale contract." *Id.* at 702. The California Court of Appeal rejected that argument, reasoning that the injunction sought would force "Del Amo to cease 'selling motor vehicles in the state of California without first providing the consumer with all [mandated] disclosures . . . in a single document.'" *Id.* at 703. In other words, the relief would not be limited to "class members or some other small group of individuals" but would benefit any member of the general public who in the future considers buying a motorcycle from Del Amo. *Id.*

Finally, in *Maldonado*, the defendant lender, Fast Auto Loans, "offered loans to California consumers . . . in immediate need of cash . . . [who] have limited credit opportunities." *Maldonado*, 60 Cal. App. 5th at 713 (alteration omitted). The plaintiffs alleged that the lender "charged unconscionable interest rates" on the loans in violation of California law. *Id.* The plaintiffs requested an injunction requiring the lender, among other things, to "cease charging an unlawful interest rate on its loans exceeding $2,500." *Id.* at 715.

Analyzing whether the plaintiffs sought public injunctive relief, the California Court of Appeal began by rejecting the lender's argument that *McGill* "only applies to plaintiffs seeking to enjoin false or misleading advertising on behalf of the general public." *Id.* at 721 (emphasis omitted). The court reasoned that "California's consumer protection laws must be liberally, not narrowly, applied." *Id.*

(citing *McGill*, 2 Cal. 5th at 954). California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), protects consumers from *any* "unfair" business practice, not just deceptive advertising. *McGill*, 2 Cal. 5th at 954. The "primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *Id.* (citation omitted). The Court of Appeal observed that "no case" had limited the "remedy of public injunctions" under the UCL "to false advertising claims." *Maldonado*, 60 Cal. App. 5th at 721.

The Court of Appeal also rejected the lender's argument that the injunction sought was "private" relief because it would benefit only the lender's customers and not the general public. The court reasoned,

> The requested injunction cannot be deemed private simply because Lender could not possibly . . . enter into agreements with[] every person in California. Such a holding would allow Lender to continue violating the UCL and [Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*] because consumers harmed by the unlawful practices would be unable to act as a private attorney general and seek redress on behalf of the public. It is enough that the requested relief has the purpose and effect of protecting the public from Lender's ongoing harm.

*Id.* at 722.

The injunction sought by Hodges includes relief that is indistinguishable from the relief that we and the California Court of Appeal deemed public injunctive relief in *Blair*, *Mejia*, and *Maldonado*. Hodges seeks an injunction

requiring Comcast to "clearly and conspicuously notify cable subscribers in writing, at the requisite times, of the period during which it maintains their [personally identifiable information ("PII")], including video activity data and demographic data (under the Cable Act and UCL)." *See* Majority op. 26. The Cable Act supplies the requisite times: *"[a]t the time of entering into an agreement to provide any cable service or other service to a subscriber* and at least once a year thereafter." 47 U.S.C. § 551(a)(1) (emphasis added). In other words, as Comcast's lawyer stated at oral argument, the disclosure requested by Hodges "is a term of the contract for contracting parties." Thus, the injunction would benefit not just existing Comcast subscribers but any member of the public who considers entering into, or does enter into, an agreement with Comcast—just as the injunctions in the cases discussed above would protect members of the public who consider contracting with or do contract with Rent-A-Center, Del Amo, and Fast Auto Loans in the future. In all four cases, the requested injunction would benefit the general public by preventing the defendant business from contracting or proposing to contract with any member of the public—not just current customers—on unfair terms.

The majority acknowledges our binding holding in *Blair* that an injunction preventing "Rent-A-Center from using an unlawful pricing structure" was public injunctive relief, but it fails to compare that relief with the relief sought here. Majority op. 17. As for *Mejia* and *Maldonado*, the majority suggests those cases were wrongly decided because the relief requested "would primarily benefit the class of persons who actually purchased motorcycles" (in *Mejia*) or "who actually sign lending agreements" (in *Maldonado*), "and not the general public as a whole." Majority op. 19, 21. That characterization is inaccurate. As here, the requirement in

*Mejia* and *Maldonado* applied before the transaction was consummated, and so applied with respect to both potential customers and actual customers. And the majority does not explain why an injunction that benefits potential *and* actual purchasers of motorcycles (or potential *and* actual borrowers) when they are considering whether to enter into a transaction does not benefit the general public; it simply asserts that conclusion. Likewise, the majority concludes with little analysis that the relief sought by Hodges regarding the privacy notice is private because it would benefit only Comcast subscribers, not "the general public as a more diffuse whole." Majority op. 28. But, again, the notice requirement applies at the point of sale and periodically thereafter and appears intended to protect the right of any potential customer—who could be anyone in California, as there are no selective criteria—to choose *not* to subscribe if the privacy term is not acceptable.

The implicit premise underlying the majority's reasoning is that the concept of public injunctive relief is confined to what the majority calls its "paradigmatic example": "an injunction against the use of false advertising." Majority op. 15. This premise rests on a fiction: Advertisements reach the public as a "diffuse whole," so an injunction barring false advertising benefits the whole, diffuse public. And conversely, this same reasoning goes, an injunction regulating the terms a business may offer consumers in a contract is private because it only benefits those consumers who actually enter into, or are considering entering into, a contract.

The notion that advertising reaches every member of the whole, diffuse public was never true, and it is even less true in today's world of highly targeted advertising, in which a great many ads are intended for a very specific audience.

Furthermore, an injunction preventing a business from publishing a false advertisement does not even directly benefit every person who would have seen the advertisement. It benefits only those consumers who would have been taken in by it—in other words, the potential buyers of the misleadingly advertised product. Yet, under the majority's logic, an injunction preventing a motorcycle dealership from posting a deceptive advertisement on its premises would be public injunctive relief, while an injunction preventing the same dealership from including an unlawful term in its proposed sale contracts would be purely private relief. That result is nonsensical. In each case, the direct beneficiaries of the injunction are a relatively specific group: consumers interested in buying motorcycles. Yet both injunctions benefit the general public because any member of the general public may at some time in the future become interested in purchasing a motorcycle and so be misled by a deceptive advertisement or by an unlawful term in a proposed contract when considering buying a motorcycle. In either context, an injunction could prevent the dealership from treating unfairly these members of the public newly considering buying a motorcycle.

Likewise, here, any member of the general public may decide to sign up with Comcast or may read the terms offered before deciding whether to sign up. As far as appears, Comcast offers its services to the public at large, the only criteria for admission into the "customer" group being willingness to sign an agreement for services and pay the requisite service rates. And Comcast in fact reaches a large number of cable consumers in California: the record shows that as of 2014, Comcast reportedly had 2.2 million subscribers in the state, or 40 percent of the state cable market. Undoubtedly, a great many members of the general

public will in the future consider contracting with, and will contract with, Comcast for cable service.

In contrast, members of the public could not freely join the group of former students in *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052 (9th Cir. 2013) (en banc). The flight school no longer operated, and the bank no longer offered student loans. *Id.* at 1056, 1061. Nor could any member of the general public choose to become an employee of the defendant software company in *Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745 (2019), or a driver for Uber in *Capriole v. Uber Technologies, Inc.*, No. 20-16030, 2021 WL 3282092 (9th Cir. Aug. 2, 2021). Surely not just anyone can walk through the doors of Quest Software, announce, "I accept your offer of employment," and start working there. And Uber requires its drivers to have one to three years of licensed driving experience and to pass a background check, among other requirements. *See Driver Requirements*, Uber, https://www.uber.com/us/en/drive/requirements/ (last visited Aug. 9, 2021). The relief sought in *Kilgore*, *Clifford*, and *Capriole* benefited a circumscribed group of people; there was no sense in which the injunctions "prohibit[ed] unlawful acts that threaten[ed] future injury to the general public." *McGill*, 2 Cal. 5th at 955.

Our court's job in deciding this question of state law is to "apply the law as [we] believe[] the California Supreme Court would apply it." *Edgerly v. City & Cty. of San Francisco*, 713 F.3d 976, 982 (9th Cir. 2013) (citation omitted). In my view, it is highly unlikely that the California Supreme Court would limit public injunctive relief to the false advertising context. At a minimum, in keeping with the liberal construction given to California's consumer protection statutes, public injunctive relief must also include injunctions affecting the contract terms a business may offer

to potential customers.[1] That was the import of our holding in *Blair*, and it is what the California Court of Appeal decided in *Mejia* and *Maldonado*. "In the absence of a controlling California Supreme Court decision, we follow decisions of the California Court of Appeal unless there is convincing evidence that the California Supreme Court would hold otherwise." *Edgerly*, 713 F.3d at 982 (internal quotation marks and citation omitted). The California Supreme Court denied petitions for review in both *Mejia* and *Maldonado*, and we have no evidence, let alone "convincing evidence," that it would disapprove those cases.

Besides drawing an arbitrary line between the public who views advertisements and the public who signs up for cable or buys motorcycles, the majority posits an additional reason why the relief sought here and in *Mejia* and *Maldonado* is private, not public. The majority maintains that "administering any injunctive relief of the form sought here would entail the consideration of the individualized claims of numerous cable subscribers." Majority op. 28; *see id.* at 23–26. I cannot see why it would. The injunction requested by Hodges would simply require Comcast to adopt new operating procedures going forward: provide a particular notice when a contract is signed, obtain consent before using its cable system to collect certain data, and so

---

[1] Because at least part of the relief Hodges seeks is public injunctive relief, I would affirm the district court's order denying the motion to compel arbitration. *See Blair*, 928 F.3d at 823, 831 n.3, 832 (affirming the denial of a motion to compel arbitration on the basis that some of the injunctive relief Blair sought was public injunctive relief). For present purposes, I need not and therefore do not address whether the other forward-looking injunctive relief that Hodges seeks—which would benefit future Comcast subscribers by, for example, requiring Comcast to stop collecting certain data without subscribers' consent—is also public injunctive relief. *See* Majority op. 26–28.

on. *See* Majority op. 26–27 (quoting complaint). No adjudicator would have to examine the claims of individual cable subscribers before entering an order like that. True, if someone were to bring an action to *enforce* the injunction, an adjudicator would need to examine the facts to determine whether the injunction had been violated, but that is also true in the false advertising context that the majority offers as a foil. *See* Majority op. 28–29. It is true in any enforcement action.

Further, the majority erroneously assumes that the arbitrator who awarded such an injunction would be responsible for enforcing it. On that assumption, the majority maintains that the injunctive relief requested here and in *Mejia* and *Maldonado* involves "procedural complexity or formality that would be inconsistent with the [Federal Arbitration Act's ('FAA's')] objective of 'facilitating streamlined proceedings' in arbitration," Majority op. 24 (quoting *Blair*, 928 F.3d at 828) (alteration omitted), leading to the pronouncement of an "alternative" holding that *Mejia* and *Maldonado* are preempted by the FAA, *id.*

But the majority's assumption as to the enforcement of an arbitrator-issued injunction is wrong. Once an arbitrator grants a claim for injunctive relief, the claimant may seek judicial confirmation of the award under California Civil Code sections 1285–1287.4. The receiving court "shall confirm the award as made," Cal. Civ. Code § 1286, and enter "judgment . . . in conformity therewith," *id.* § 1287.4. The resulting judgment "may be enforced like any other judgment of the court in which it is entered," *id.*, meaning that a motion for enforcement may be brought before the court, *see O'Hare v. Mun. Res. Consultants*, 107 Cal. App. 4th 267, 278 (2003) (explaining that an arbitrator "may award permanent injunctive relief," which is "enforceable

only when confirmed as a judgment of the superior court"). The FAA likewise provides that a judgment confirming an arbitration award "may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13(c).

The possibility that a future motion to enforce an injunction awarded by an arbitrator might require factfinding by a court has no bearing on the complexity of the arbitration itself. It "does not interfere with the bilateral nature of a typical consumer arbitration" or "require[] a 'switch from bilateral . . . arbitration' to a multi-party action." *Blair*, 928 F.3d at 829. As the majority's premise of incompatibility between the key features of arbitration and the public injunctions permitted by *Mejia* and *Maldonado* is mistaken, its alternative holding is incorrect.

The majority has failed to provide a convincing rationale for the distinction it draws in this case between relief benefiting consumers who contract with businesses and relief benefiting consumers who are exposed to advertisements. Because the distinction is untenable and I believe it would be rejected by the California Supreme Court, I dissent. I would affirm the district court's denial of the motion to compel arbitration.